F.J. HANSHAW ENTERPRISES, INC., a California corporation, Plaintiff-counter-defendant-Appellant,

Frederick J. Hanshaw, Counter-defendant-Appellant,

v.

EMERALD RIVER DEVELOPMENT, INC., an Arizona corporation, Defendant–Appellee,

Gordon Hanshaw, Defendant-counter-claimant-Appellee,

Richard A. Marshack, Receiver–Appellee.

No. 99–55395.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 2000

Filed April 5, 2001

1130

Jennifer L. Keller, Irvine, California, Cheryl L. Thomas, Santa Ana, California, for the plaintiff, counter-defendants, appellants.

Timothy L. McCandless, Los Angeles, California, for the defendant, counterclaimant, appellee.

Before: KOZINSKI, GRABER and FISHER, Circuit Judges.

FISHER, Circuit Judge:

This appeal arises from a bitter sibling rivalry between two wealthy brothers, Frederick and Gordon Hanshaw, whose dispute wound up in a partnership dissolution proceeding in the federal district court. As the court-appointed receiver neared completion of his lengthy, often contentious accounting process and was preparing his report recommending the ultimate allocation of millions of dollars in assets between the brothers, Frederick Hanshaw allegedly offered the receiver a bribe during a private lunch meeting. Once alerted to this alleged bribe, the district court was confronted with the tricky task of determining what actually happened and whether Frederick had attempted to defraud the court. After conducting two evidentiary hearings, the district court found that Frederick had attempted to bribe the receiver, and sanctioned Frederick $500,000 payable to the United States and imposed a $200,000 surcharge against him in favor of Gordon. The principal questions we must address on this appeal relate to the scope and limits of the district court's authority to deal with allegations of attempted corruption of the judicial pro-

cess, and the procedural protections the accused party is entitled to before sanctions may be imposed.

## FACTUAL AND PROCEDURAL BACKGROUND

Frederick Hanshaw is the sole shareholder of F.J. Hanshaw Enterprises, Inc. ("Enterprises"), a California corporation. Gordon Hanshaw is the president of Emerald River Development, Inc. ("Emerald River"), an Arizona real estate development corporation. This acrimonious litigation began in 1994 when Enterprises sued Emerald River and Gordon for a portion of Emerald River's profits. Emerald River and Gordon counter-sued both Enterprises and Frederick, claiming a de facto partnership existed and seeking a dissolution of the partnership.[1] After lengthy delays, bitter accusations, contempt sanctions, a failed settlement (the abrogation of which we upheld on appeal, *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, No. 97–55751, 1998 WL 416505 (9th Cir. June 15, 1998) (unpublished)), and a trial, the district court ordered the dissolution of the partnership and appointed a receiver to oversee allocation of partnership assets. In its order appointing the receiver, the court enjoined the parties from interfering in any manner with the discharge of the receiver's duties.

Near the end of the receivership process, Frederick met with the receiver for lunch and offered him $100,000 and future business "to get this case resolved." After two evidentiary hearings—including hearing testimony from the three individuals present at the lunch meeting, Frederick, the receiver and his assistant—the district court found Frederick's offer to be an attempted bribe made "corruptly and in bad faith" and an attempted fraud on the court. Relying on its inherent and equitable powers, the court sanctioned Frederick and Enterprises $500,000 and imposed a $200,000 surcharge in favor of Gordon.

The ultimate property distribution deducted Frederick's sanction and surcharge from Enterprises' share of the partnership assets, the district court finding that Enterprises was Frederick's alter ego and that he was its agent.

On appeal, Frederick and Enterprises argue that the district court's sanction and surcharge were tantamount to a finding of criminal contempt and, therefore, Frederick should have been afforded various procedural protections applicable to criminal trials. Appellants also contend that (a) the evidence was insufficient to support the district court's sanction and surcharge; (b) the sanction imposed against Frederick should not have been paid out of Enterprises' funds—a challenge to the district court's alter ego finding; (c) the district court should have been recused from presiding over the sanctions hearing; and (d) the ultimate distribution of the partnership assets was inequitable. We have jurisdiction pursuant to 28 U.S.C. § 1291. We hold that the $500,000 sanction was criminal in nature and thus required commensurate due process protections, some of which Appellants did not receive—including the right to an independent prosecutor, a jury trial and a reasonable-doubt standard of proof. Accordingly, we vacate the $500,000 sanction and the distribution of assets reflecting the imposition of that sanction and remand for further proceedings related thereto. On all other issues we affirm.

\* \* \*

On June 22, 1998, Frederick telephoned the court-appointed receiver, Richard Marshack, and asked to meet with him. At that time, Marshack's final report allocating assets between Frederick and Gordon was nearing completion, including the receiver's resolution of several key items involving over one million dollars in value. That afternoon, Frederick, Marshack and his assistant, Debby Slack, met for lunch

1. Gordon's wife, Shelba, was also a named party. Her interests are coextensive with Gordon's and treated the same.

at a restaurant. What transpired at this lunch meeting is the basis for the district court's finding that Frederick attempted to bribe Marshack.

The first notice the district court received of a possible attempted bribe was a copy of a file memorandum Marshack wrote on July 2, 1998 (some 10 days after the lunch meeting) and faxed to the district court that day. In the memorandum, Marshack recounted that, when Slack went to the restroom shortly after they arrived, Frederick "leaned forward and low over the table and said 'while she is gone, I want you to know that I will pay you $100,000 to get this case resolved.'" According to the memorandum, Marshack immediately told Frederick a receiver could not accept payment from either party, whereupon Frederick offered to retain Marshack as counsel to work on the case. As soon as Slack returned to the table, Marshack "reiterated" to Slack his discussion with Frederick, who did not deny Marshack's reiteration. Marshack and Slack then explained the role of a receiver to Frederick, including the limitation that any compensation must be approved by the district court. Marshack concluded his memo by saying, "after I told [Frederick] I could not accept the money without full disclosure, he indicated he would recommend it to the Court as additional compensation."

Confronted with this serious allegation of a party's misconduct, Judge Taylor took two actions: First, he referred the matter to the local office of the Federal Bureau of Investigation for investigation of possible criminal violations.[2] Second, he issued a minute order on July 13, 1998, ordering the parties, their respective counsel, and Marshack and Slack to appear for an evidentiary hearing on July 16. The district court did not specify the exact nature of the events giving rise to the order, but stated that "[t]he Court will inquire about recent events involving Receiver Richard A. Marshack."

At the July 16 evidentiary hearing, the district court questioned Marshack and Slack about the June 22 lunch meeting. Frederick, however, on the advice of his specially retained criminal counsel, invoked his Fifth Amendment right not to testify.

Slack testified that Marshack had informed her, upon her return to the table, that Frederick "really want[ed] to get the case settled [and] that he was willing to compensate [the receiver] separately for, uh, assisting in getting the case settled. Um, he also told me that [Frederick] had indicated that he wanted to hire [the receiver's firm] for that purpose." Slack did not believe Marshack had informed her during lunch of the exact amount of money Frederick had offered (although she testified that Marshack later told her that the amount was $100,000). Finally, Slack recounted Marshack's subsequent confusion regarding the events in question and his initial uncertainty regarding whether an attempted bribe had occurred.

Marshack's testimony was consistent with his July 2 file memorandum. In addition, he explained that he had not contacted the district court immediately after the lunch because he had difficulty interpreting the import of Frederick's offer. Pressed to specify whether Frederick's offer was a bribe, Marshack stated, "I am 100–percent certain as to what he said. I am, uh—the uncertainty comes as to what he meant." But Marshack did say he was 85 to 90 percent certain that Frederick had attempted to bribe him in his capacity as receiver.

Given the information gathered during the July 16 hearing, the district court on August 3 scheduled a second evidentiary hearing. The order stated: "Notice is hereby given that, arising out of the events of June 22, 1998, the Court will consider imposing sanctions and/or surcharges against Frederick J. Hanshaw up to the amount of one million dollars, and/or other appropriate evidentiary or property divi-

---

2. The FBI conducted several interviews but ultimately decided not to proceed further.

sion sanctions and/or surcharges." The district court invited both parties to file "any briefing they consider appropriate on the topic of potential sanctions and/or surcharges." The court stated that, "[a]t the hearing, the Court [would] consider testimony presented at the July 16, 1998, evidentiary hearing" and any further testimony or other evidence the parties wished to present.

Neither Frederick nor Enterprises filed a brief on the issue of sanctions or any opposition to the district court's order. They did, however, move to disqualify Judge Taylor, a motion Judge McLaughlin considered and denied on the same day it was filed.

At the second evidentiary hearing on October 20, 1998, the district court heard argument on both the sanctions issue and the receiver's final property distribution recommendations. On the sanctions issue, Frederick's new criminal defense counsel argued that the proceedings amounted to a criminal contempt hearing and that insufficient notice of the basis for the sanctions being considered had prevented Frederick from preparing properly for the second hearing. The district court responded as follows:

> As is, I think, apparent from that statement and as I stated to the counsel this morning [at an earlier hearing], this is not a criminal contempt proceeding. This is not a civil contempt proceeding. It is those two items, sanctions and surcharges. The sanctions aspect calls upon the court's inherent powers to control the proceedings before it and to prevent interference with the court's appointed officers. The court has the inherent power to order sanctions if there is a violation of that nature.
>
> Additionally, we have what might be an unusual situation, that is, this court is an equitable proceeding. So the court has the equitable power to order a surcharge on any ground that may be appropriate in the case.... Those are the two formats.

As far as whether there has been notice of this, I think it was pretty clear from what occurred earlier that the court had very fragmentary information at the outset. There were no charges or allegations to be brought. Nobody was up on charges of any sort. The court wanted to make an inquiry as to what had happened. That's very common in cases, probably much more common in criminal cases than in civil cases, for the court to conduct a short evidentiary hearing to see what in the heck is going on. And then based on that, we determine what's going on.

It is inconceivable to me that it could be argued that [Frederick] didn't know what was happening [at the first evidentiary hearing]. [Frederick] came to that hearing with his criminal attorney in tow obviously to consider what should be done in a situation like that.

Marshack testified again at the second evidentiary hearing. He was questioned by counsel for both parties and very briefly by the district court. Frederick called his counsel for the partnership dissolution and one of his brothers as witnesses. The key witness was Frederick himself, who chose not to continue to assert his Fifth Amendment rights. He described the stress of the lawsuit and asserted that his offer to Marshack was simply a request that Marshack work overtime (therefore entitling him to more money) to resolve the case. Frederick testified that he never mentioned the $100,000 figure to Marshack, denied offering to hire Marshack's firm and contended that he was "absolutely positive [his conversation with Marshack] did not amount to a bribe." Frederick claimed he repeatedly stated he wanted to offer extra money only "if it's legal for you to help me."

On January 6, 1999, invoking its "inherent power to sanction deplorable conduct in litigation" and also citing its May 12, 1997 Order as having warned the parties they may be surcharged for any misconduct during the pendency of the receiver-

ship, the district court issued an Order for Sanctions and Surcharge.[3] The court found:

> [A]t a time when the Receiver's report was imminent and several key items in value over one million dollars remained in issue, Frederick Hanshaw attempted to improperly and corruptly influence the actions of the Receiver by offering him money and future employment. In particular, Frederick Hanshaw offered the Receiver $100,000, offered to seek a "bonus" payment for the Receiver from the Court, and offered the receiver future employment as his attorney, in exchange for favorable treatment in the receiver's actions and recommendations. The Court finds the explanations to the contrary by Frederick Hanshaw to be not credible. Frederick Hanshaw was and is a highly skilled businessman and investor. He was not acting out of ignorance, inexperience, or lack of sophistication in his improper contact with the Receiver. He knew exactly what he was doing. He acted corruptly and in bad faith.

The district court ordered "Frederick Hanshaw to be surcharged in favor of Gordon Hanshaw in the distribution of receivership assets in the amount of $200,000," sanctioned "Frederick Hanshaw in the amount of $500,000 payable to the United States" and ordered that "[t]he receivership distribution will provide for payment from Frederick Hanshaw's (or his corporation's) share." The court acknowledged that the sanction was large, but reasoned that "the amount imposed here is necessary and appropriate" because of Frederick's wealth (estimated at $54 million) and the amount of money at stake in the case.

Subsequently, in response to issues briefed by the parties, the district court on June 8 made additional findings, including that (a) "[t]here is, in effect, an *alter ego* relationship between Frederick J. Hanshaw and his corporation, [Enterprises], whereby the individual conducts his personal business affairs through the corporation," and (b) "[i]n attempting to bribe the Court's receiver, Frederick J. Hanshaw acted on his own behalf and also as an agent of his corporation in attempting to corruptly secure an improper benefit for both himself and his corporation."

On July 1, 1999, the district court issued its Second Corrected Judgment Allocating Partnership Property. The final partnership allocation was $3,246,686 in property and cash to Gordon and $2,378,020 in property to Frederick.[4] This timely appeal followed.

## DISCUSSION

■ We review the district court's imposition of sanctions pursuant to its inherent power for an abuse of discretion. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). With respect to sanctions, a district court's factual findings are given great deference. *See Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997). A district court's decision to disregard a corporate form and to impose liability under the equitable "alter ego" doctrine is reviewed for clear error. *See Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999). Denial of a recusal motion is reviewed for abuse of discretion. *See United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir.1997).

---

3. The court's reference to its May 12, 1997 Order appears to refer to paragraph 17(h) providing that the parties "[s]hall not directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Receivership Assets."

4. The actual property allocation to Frederick was only approximately $450,000 less than the property allotted to Gordon, but Frederick's total was reduced by approximately $250,000 cash owed to the partnership (to be used to pay the sanction) and Gordon's total was increased by approximately $150,000 cash (reflecting the surcharge assessed against Frederick).

## I. Sanctions Imposed Against Frederick and Enterprises

Clearly the district court confronted a difficult situation once it received Marshack's July 2 memorandum with its allegations of serious misconduct by Frederick Hanshaw. Given that the event occurred outside the courtroom, and had not progressed beyond an oral offer to some tangible evidence of bribery, the court took reasonable initial steps to try to determine whether there was substance to Marshack's belief that he had been offered a bribe. Indeed, Appellants do not seriously urge that the court erred in bringing the relevant parties into court for the first evidentiary hearing, although they protest that they should have had better notice of the specific accusation—an issue we address later. Rather, the essence of Appellants' complaint here is that, once the court proceeded to put Frederick on trial for attempted bribery, he was effectively charged with criminal misconduct and was entitled to the panoply of constitutional rights afforded anyone charged with a crime. We believe the district court attempted in good faith to fashion a process to vindicate the integrity of the judicial proceedings while affording Frederick a fair hearing. We conclude, however, that the proceeding was criminal in nature and subject to the concomitant due process procedural guarantees. The circumstances of this case illustrate why such procedures are appropriate.

 All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders. *See Chambers*, 501 U.S. at 43–44, 111 S.Ct. 2123. Through this power, courts have the ability to punish conduct both within their confines and beyond, regardless of whether that conduct interfered with trial. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and assess fines. *See Chambers*, 501 U.S. at 44–45, 111 S.Ct. 2123.

 Courts have the ability to address the full range of litigation abuses through their inherent powers.[5] *See id.* at 46, 111 S.Ct. 2123. While it is preferable that courts utilize the range of federal

---

**5.** Appellants have not challenged the district court's ability to order them to pay a fine to the United States under its inherent powers as opposed to its statutorily delimited criminal contempt powers. *Chambers* explains that district courts are able to exercise their inherent powers in a broad range of circumstances. *See* 501 U.S. at 46, 111 S.Ct. 2123. Nonetheless, 18 U.S.C. § 401 places some constraints upon that power. *See Nye v. United States*, 313 U.S. 33, 43–48, 61 S.Ct. 810, 85 L.Ed. 1172 (1941). Section 401 provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as-
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
This statute has been interpreted to limit federal courts' ability to hold someone in criminal contempt. *See, e.g., Cammer v. United States*, 350 U.S. 399, 407–08, 76 S.Ct. 456, 100 L.Ed. 474 (1956) (holding that lawyers are not "officers" of the court within the meaning of the predecessor to § 401 and overturning a contempt judgment against an attorney); *Nye*, 313 U.S. at 48–49, 61 S.Ct. 810 (holding that misbehavior that occurred over 100 miles from the courthouse could not be punished under the predecessor to § 401(1)); *Ex Parte Robinson*, 19 Wall. 505, 86 U.S. 505, 512, 22 L.Ed. 205 (1873) (holding that the district court could not disbar an attorney under the predecessor to § 401). Here, not only did Frederick engage in what was arguably a bribe and fraud on the court, he also appears to have violated the district court's May 12, 1997 order which prohibited him from interfering with the receiver's duties. Because Appellants have not argued that the district court had to proceed under § 401, we do not address that issue. *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1186 n. 4 (9th Cir.1997) (holding that before an argument will be considered on appeal, it must be raised sufficiently for the trial court to rule on it).

rules and statutes dealing with misconduct and abuse of the judicial system, courts may rely upon their inherent powers to sanction bad faith conduct even where such statutes and rules are in place.[6] *See id.* at 50, 111 S.Ct. 2123.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44, 111 S.Ct. 2123.

A troublesome aspect of a trial court's power to impose sanctions, either as a result of a finding of contempt, pursuant to the court's inherent power, or under a variety of rules such as Fed.R.Civ.P. 11 and 37, is that the trial court may act as accuser, fact finder and sentencing judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed. The absence of limitations and procedures can lead to unfairness or abuse.

*Mackler Prods., Inc. v. Cohen,* 146 F.3d 126, 128 (2d Cir.1998) (citation omitted).

To protect against abuse and to ensure parties receive due process, individuals subject to sanction are afforded procedural protections, the nature of which varies depending upon the violation, and the type and magnitude of the sanction. The more punitive the nature of the sanction, the greater the protection to which an individual is entitled. Although contempt and sanctions are not identical, the principles the Supreme Court articulated for cases of contempt in *International Union, United Mine Workers of America v. Bagwell,* 512

U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), guide our determination of what procedural protections are necessary in imposing sanctions under a court's inherent powers.

In *Bagwell,* a state trial court held a labor union in contempt for numerous breaches of the court's orders. After a hearing, the trial court found the union had committed 72 violations of the court's injunctions. The court fined the union $642,000 and warned that any future violent breach of the court's injunctions would be subject to a $100,000 fine and any nonviolent breach would be subject to a $20,000 fine. After seven hearings, the court found the union in contempt for more than 400 violations of its orders. The court levied more than $64 million in fines, $12 million payable to the employers and $52 million payable to the Commonwealth of Virginia and the two counties most affected by the violations. The parties eventually settled their disputes and agreed to vacate the $12 million fine. The trial court agreed to the dismissal of the suit and the $12 million fine but refused to vacate the $52 million penalty, characterizing it as a civil, coercive fine. *Id.* at 824–25, 114 S.Ct. 2552.

The Supreme Court held that the $52 million in fines were criminal penalties. The Court identified several factors to consider in determining the nature of a sanction. "[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved.... [A]

---

**6.** For examples of statutes and rules that address abuses of the judicial process, see 18 U.S.C. §§ 401 & 402 (criminal contempt); 18 U.S.C. § 1501 et seq. (obstruction of justice); 28 U.S.C. § 1927 (award cost expenses, attorney's fees against attorneys who multiply proceedings); 28 U.S.C. § 1826 (recalcitrant witnesses); Fed.R.Civ.P. 11 (sanction a party or the party's attorney for filing groundless pleadings, motions or other papers); Fed. R.Civ.P. 16(f) (sanction a party or party's attorney for failure to abide by a pretrial order); Fed.R.Civ.P. 26(g) (sanction a party or party's attorney for baseless discovery requests or objections); Fed.R.Civ.P. 30(g) (award expenses caused by failure to attend a deposition or to serve a subpoena on a party to be deposed); Fed.R.Civ.P. 37(d), (g) (award expenses when a party fails to respond to discovery requests or fails to participate in the framing of a discovery plan); Fed.R.Civ.P. 41(b) (dismiss an action or claim of a party that fails to prosecute, to comply with the Federal Rules or to obey an order of the court); Fed.R.Civ.P. 45(f) (punish any person who fails to obey a subpoena); Fed.R.Civ.P. 56(g) (award expenses or contempt damages when a party presents an affidavit in a summary judgment motion in bad faith or for the purpose of delay); Fed.R.Crim.P. 42 (procedures for criminal contempt); Fed. R.App. P. 38 (power to award damages and costs for frivolous appeal).

contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant' " and criminal if it is " 'punitive, to vindicate the authority of the court.' " *Id.* at 827–28, 114 S.Ct. 2552 (citations omitted). A fine is civil and remedial if it "either 'coerce[s] the defendant into compliance with a court's order, [or] . . . compensate[s] the complainant for losses sustained.' " *Id.* at 829, 114 S.Ct. 2552 (citation omitted) (alterations in original). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. Thus, a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id.* at 829, 114 S.Ct. 2552 (citations omitted).

■ Applying these criteria, we conclude the $500,000 sanction at issue here was criminal in nature. It was clearly punitive and intended to vindicate the court's authority and the integrity of the judicial process. The sanction was a substantial "flat, unconditional fine"; was not intended to compensate Gordon but rather was made payable to the United States; and could not be avoided by future compliance.[7] The district court did state that the sanction was intended "partly to compensate for inconvenience and waste of time caused the Court," but that is not the same as compensation to "the complainant for losses sustained" contemplated by *Bagwell.*

Given that the $500,000 sanction was criminal in nature, we must decide what procedural protections Frederick should have been afforded. *Bagwell* addressed this issue directly as to criminal contempt, and, as we shall explain, we believe the same principles are applicable in the context of sanctions.[8] The Supreme Court's jurisprudence in this area has "attempted to balance the competing concerns of necessity and potential arbitrariness by allowing a relatively unencumbered contempt power when its exercise is most essential, and requiring progressively greater procedural protections when other considerations come into play." *See id.* at 832, 114 S.Ct. 2552.

■ The Court has distinguished between contempts that occur in a court's presence (direct contempts) and those that occur outside the courtroom (indirect contempts). A court's need for contempt authority is at its greatest when contumacious conduct occurs in its presence and threatens its immediate ability to conduct its proceedings. *See id.* Thus, "petty, direct contempts in the presence of the court traditionally have been subject to summary adjudication" because of a court's "substantial interest in rapidly coercing compliance and restoring order, and because the contempt's occurrence before the court reduces the need for extensive factfinding and the likelihood of an erroneous deprivation . . . ." *Id.* If a court delays punishing a direct contempt until a later time in the proceedings, however, the court then must provide notice and a hearing. *See id.* at 832–33, 114 S.Ct. 2552. Furthermore, before serious criminal penalties can be imposed for a direct or indirect contempt, the contemnor must be afforded the full protection of a criminal jury trial. *See id.* at 833, 114 S.Ct. 2552; *Bloom v. Illinois,* 391 U.S. 194, 210, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

■ "Still further procedural protections are afforded for contempts occurring out of court, where the considerations justifying expedited procedures do not pertain." *Bagwell,* 512 U.S. at 833, 114 S.Ct.

---

7. Whether a fine is payable to the court—or as here, the United States—as opposed to the complainant is a relevant, although not necessarily determinative, factor in determining whether a sanction is punitive. *See Hicks v. Feiock,* 485 U.S. 624, 631–32, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); *see also Bingman v. Ward,* 100 F.3d 653, 655–56 (9th Cir.1996); *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 779 (9th Cir.1983).

8. Many of the procedural protections applicable to criminal contempt proceedings are detailed in Federal Rule of Criminal Procedure 42.

2552. An individual charged with an indirect criminal contempt is entitled to the right to be advised of the charges, *Young*, 481 U.S. at 794, 107 S.Ct. 2124; the right to a disinterested prosecutor, *id.* at 808, 107 S.Ct. 2124; the right to assistance of counsel, *Cooke v. United States*, 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925); a presumption of innocence, *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911); proof beyond a reasonable doubt, *id.;* the privilege against self-incrimination, *id.;* the right to cross-examine witnesses, *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); the opportunity to present a defense and call witnesses, *Cooke*, 267 U.S. at 537, 45 S.Ct. 390; and the right to a jury trial if the fine or sentence imposed will be serious, *Bagwell*, 512 U.S. at 837 n. 5, 114 S.Ct. 2552.[9]

 We hold that when a court uses its inherent powers to impose sanctions that are criminal in nature, it must provide the same due process protections that would be available in a criminal contempt proceeding. We agree with the reasoning of the Second Circuit in *Mackler Productions*, which held substantial punitive sanctions to be enough like criminal contempt to warrant the same due process protections. In *Mackler Productions*, the district court, relying on its inherent authority, ordered the appellant to pay a $45,000 compensatory fine to the opposing party and a $10,000 fine payable to the court. 146 F.3d at 127–28. The Second Circuit vacated the $10,000 sanction, relying on *Bagwell*. It reasoned:

> [T]he consequences of an adjudication of criminal contempt are different from those flowing from the imposition of sanctions. The person found guilty of criminal contempt, unlike a person on whom sanctions have been imposed, now carries a criminal conviction on his record. Furthermore, possible punishments for contempt, unlike sanctions, include imprisonment.

> Nevertheless, sanctions and contempts raise certain similar concerns. Whether or not a finding of contempt is involved, unfairness and abuse are possible, especially if courts were to operate without any framework of rules or cap on their power to punish. In either case, the individual bears the risk of substantial punishment by reason of obstructive or disobedient conduct, as well as of vindictive pursuit by an offended judge. We conclude, notwithstanding the differences mentioned above, that the imposition of a sufficiently substantial punitive sanction requires that the person sanctioned receive the procedural protections appropriate to a criminal case.

*Id.* at 129–30.

We do not suggest that the district court here was abusive or vindictive. To the contrary, as we have observed above, the court made a serious, good-faith effort to pursue its inquiry and reach its conclusions fairly after hearing all the relevant evidence. Nonetheless, it is the inherent *potential* for abuse and unfairness that mandates affording the accused party—as a matter of procedural structure—the due process rights normally guaranteed to criminal defendants. As both *Bagwell* and *Mackler Productions* recognize, due process guarantees need to be observed when a court resorts to its inherent powers to punish misconduct simply because those powers are enormous; the procedural guarantees are the restraint that protects against intended or unintended abuse of that power.

 Here, Frederick and Enterprises received some but not all of the procedural protections to which they were entitled. The attempted bribe occurred out of the court's presence and the $500,000 fine is a "serious" penalty.[10] Therefore, they were

---

9. The Supreme Court has not decided where the line between serious and petty fines should be drawn. *See Bagwell*, 512 U.S. at 837 n. 5, 114 S.Ct. 2552.

10. We need not decide today the precise limit for a "serious" sanction entitling an individual to a jury trial. However, we can safely conclude that a $500,000 fine, even to a wealthy individual like Frederick Hanshaw, is

entitled to a jury and all the rights a contemnor receives when charged with indirect criminal contempt. They were entitled to notice of the charges, but we conclude the district court's orders and statements during the first evidentiary hearing provided adequate notice of the bribery charge and the potential for a monetary sanction in the range of $1 million. They also had counsel, the opportunity to confront the witnesses against them and the opportunity to call their own witnesses. Importantly, however, they did not have the benefit of an independent prosecutor, a jury trial or a standard of proof beyond a reasonable doubt.

### Independent Prosecutor

■ As noted earlier, the court initially referred Marshack's memo to the FBI. We agree that a referral to the U.S. Attorney or the FBI is an appropriate option; they have the investigative resources and authority, and it is their role to investigate and prosecute criminal activity. But the court retains its own authority and need to rectify abuses or corruption of its own judicial process, to maintain the integrity of the court. *See Young*, 481 U.S. at 796, 107 S.Ct. 2124. Thus, although the court may seek the assistance of the executive branch to investigate and prosecute, the court does not abdicate the decision to sanction misconduct. If, as a matter of prosecutorial discretion, the executive branch declines to prosecute, courts still have the authority to appoint private attorneys to prosecute actions. *See id.* at 800–01, 107 S.Ct. 2124.

A prosecutor, government or private, can function as an independent, dispassionate investigator and presenter of evidence. A prosecutor can gather evidence and investigate matters more thoroughly than a court can at an evidentiary hearing alone. He or she can also serve to shorten the length of trial by culling through evidence and witnesses beforehand to determine which are relevant and credible.

■ Moreover, a prosecutor plays an important role in the criminal process. Prosecutors, both government and specially appointed, have an ethical duty to ensure that "justice be ... done" and, while responsible for prosecuting the guilty, they must also make sure that the innocent do not suffer. *Id.* at 803, 107 S.Ct. 2124 (internal quotation marks omitted); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (describing the role of prosecutors). In a situation where serious criminal penalties are at stake, an independent prosecutor can help place needed distance between the offended court and the alleged wrongdoer.

### Jury Trial

■ A jury of one's peers is of the utmost importance when a court uses its inherent powers to impose a serious criminal sanction. In the context of a criminal trial:

> the primary purpose of the jury is to prevent the possibility of oppression by the Government; the jury interposes between the accused and his accuser the judgment of laymen who are less tutored perhaps than a judge or panel of judges, but who at the same time are less likely to function or appear as but another arm of the Government that has proceeded against him.

*Baldwin v. New York*, 399 U.S. 66, 72, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970) (holding that a defendant who faced a sentence of six months was entitled to a jury trial). This purpose becomes all the more important in the context of criminal contempt or punitive sanctions, where the accuser and, in some instances, victim and key witness is the trial judge or, as here, a representative of the court. For the individual ac-

---

serious. *See Blanton v. City of North Las Vegas, Nev.*, 489 U.S. 538, 544, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989) (implying that $5,000, at least in 1989 dollars, is the cutoff for a serious fine warranting a jury trial);

*Bagwell*, 512 U.S. at 837 n. 5, 114 S.Ct. 2552; *Crowe v. Smith*, 151 F.3d 217, 228 n. 13 (5th Cir.1998) (holding that a $75,000 fine assessed upon an individual is "serious").

cused of misconduct and susceptible to serious punitive sanctions, the thought that the person he or she wronged will be the same person making the determination of guilt offends notions of fairness. Even if judges are able to separate their roles as accuser and fact finder, which is undeniably difficult, it would still *appear* to the accused as fundamentally unfair.

### Reasonable–Doubt Standard

■ In situations where serious punitive penalties are being imposed, the accused deserves the protection of a higher standard of proof to ensure that an innocent party will not be punished. Proving guilt beyond a reasonable doubt in criminal matters has a long common law tradition that has been imported into our Constitution. *See Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 2356, 147 L.Ed.2d 435 (2000) (holding that a fact that increases the prescribed statutory maximum penalty to which a criminal defendant is exposed must be submitted to a jury and proved beyond a reasonable doubt). The reasonable-doubt standard plays several roles in our scheme of criminal procedure. Its primary purpose is to reduce the risk of conviction based upon factual error. *See In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that juveniles are entitled to standard of proof beyond a reasonable doubt when charged with a criminal violation). In criminal matters, the interests of the individual "are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself." *Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (footnote omitted).

Further, the reasonable-doubt standard assures the community that the an innocent party will not be wrongfully punished. "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068. This is all the more important in a situation in which a judge is accusing an individual of conduct that is abusive of the court or its processes. The community should be assured that an independent trier of fact found the individual guilty of the misconduct with the utmost certainty.

■ Here, the district court conducted two hearings at which it gathered facts for its determination that Frederick and Enterprises acted in bad faith. At neither of those hearings did an independent attorney prosecute the case. The court set forth the charge against Appellants, and Gordon's counsel, Timothy McCandless, was responsible for presenting witnesses to prove the charge and for arguing that misconduct occurred. Because opposing counsel had a direct interest in the result of the proceedings—Gordon was asking for a surcharge in his favor because of the misconduct—McCandless was not independent. *See Young,* 481 U.S. at 809, 107 S.Ct. 2124 (holding that counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order).

■ The court also served as the finder of fact and made its factual determinations by a clear and convincing evidence standard. Because the misconduct at issue occurred outside the court's presence and the ultimate sanction imposed was $500,000, Appellants were entitled to the greater protection that a reasonable-doubt standard of proof provides, *see In re Winship,* 397 U.S. at 363, 90 S.Ct. 1068, and the disinterested fact finding and even-handed adjudication a jury trial ensures. *See Bagwell,* 512 U.S. at 837–38, 114 S.Ct. 2552. Because Appellants did not receive the due process protections to which they were entitled, we vacate the $500,000 sanction. Upon remand, the district court may reinstitute punitive sanction proceedings

so long as Appellants are afforded the requisite due process protections.

## II. Surcharge Imposed by the District Court

The district court also surcharged Frederick and Enterprises $200,000 after considering the evidence of costs that Gordon had incurred because of the bribe attempt. Appellants again do not challenge the court's power to impose such an award or the size of the award. Their contentions are that the surcharge, like the $500,000 sanction, could be imposed only with the full panoply of criminal procedural protections and that the district court abused its discretion by finding that Frederick acted in bad faith. We disagree.

■ Unlike a punitive sanction, particularly one that is payable to the government or the court, a compensatory award payable to a party does not place the court in a prosecutorial role. When determining whether and how much to compensate a party, the court sits in the same adjudicatory position it does when it resolves most disputes. Although the court has an institutional interest in the matter, the court in essence is resolving a dispute between litigants: one party claims it was wronged by the other and wants to be reimbursed for the losses it sustained. For these reasons, when the court is adjudicating a compensatory civil sanction, the traditional procedural protections applicable to civil proceedings are sufficient to satisfy the Constitution's requirement of due process.

■ Applying the *Bagwell* factors discussed above, we must determine whether the $200,000 award was compensatory and thus civil in nature. *See Bagwell*, 512 U.S. at 829, 114 S.Ct. 2552 (holding fine is civil if it is meant to compensate the complainant). We conclude that it was. The award was payable to Gordon, the counter-claimant, and was meant to offset the expenses he incurred because of Frederick's misconduct. As a result of the bribe attempt, the entire receivership process was delayed by nearly six months and Gordon was forced

to incur additional attorney's fees. The court had before it the billing reports from Gordon's attorneys and Gordon had asked the court for $824,000 in compensation. Gordon argued to the court that an $824,000 award "would be the amount that it's cost us to get to this point in that [Frederick] has thrown it all away in offering a bribe to Mr. Marshack." Exercising its discretion, the court awarded $200,000 to Gordon, an amount Frederick has not challenged. *See Chambers,* 501 U.S. at 56–58, 111 S.Ct. 2123 (upholding a civil sanction of $996,645 which represented all the opposing party's attorney's fees). Based upon this record, we conclude that the $200,000 award was intended to compensate Gordon for losses sustained as a result of Frederick's misconduct and is civil in nature. *See Bagwell*, 512 U.S. at 829–30, 114 S.Ct. 2552.

■ We do not agree with the district court's characterization of its compensatory remedy as a "surcharge," however. A surcharge is an " 'imposition of personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties.' " *Le Blanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 7 (1st Cir.1999) (quoting *Black's Law Dictionary* 1441 (6th ed.1990)). Typically, surcharges are levied when trustees breach their fiduciary duties. *See, e.g., Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (upholding surcharge of reorganization trustee for profits made by employees whom he knowingly permitted to trade in securities of debtor's subsidiary corporation); *In re San Juan Hotel Corp.*, 847 F.2d 931 (1st Cir.1988) (upholding surcharge of trustee for mismanagement of estate). In rarer instances, surcharges are assessed against individuals who hold positions of trust similar to a trustee. *See, e.g., Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759 (3d Cir.1974) (stating directors and officers of corporation could be surcharged for breaching their fiduciary duties); *Nedd v. United Mine Workers of Am.*, 556 F.2d

190 (3d Cir.1977) (stating union could be surcharged for violations of its duty of loyalty to pensioners).

 Frederick was neither a fiduciary nor in a position of trust. The district court levied the surcharge against Frederick and Enterprises for Frederick's attempted bribe of the receiver. There is nothing in the record to suggest that Frederick had a fiduciary or fiduciary-like duty to Gordon or anyone involved in this matter. Frederick and Gordon were partners at one time, but that partnership had been dissolved and its assets turned over to the receiver long before Frederick's offer to Marshack. The $200,000 transfer of assets from Frederick to Gordon, therefore, cannot properly be characterized as a "surcharge."

 We, however, are not bound by the mere label the district court gave its compensatory award. *See Primus,* 115 F.3d at 648 (9th Cir.1997) (holding that a sanction could be upheld under a district court's inherent powers despite the court's failure to specify the source of its authority). As described above, district courts have broad authority to address misconduct in the judicial process and compensate the victims of that misconduct. *See Chambers,* 501 U.S. at 43–46, 111 S.Ct. 2123. The district court here acted within that authority, regardless of the label it applied, when it ordered Frederick and Enterprises to compensate Gordon because of the attempted bribe. We therefore review that award to determine whether Appellants were afforded the appropriate procedural protections, and whether the court abused its discretion in imposing the award at all.

 Because the award was not criminal in nature, Appellants were not entitled to the full panoply of criminal due process protections—particularly a jury trial, reasonable-doubt standard of proof and an independent prosecutor. They were, however, entitled to notice, an opportunity to be heard and a finding of bad faith.[11] *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (holding courts have inherent power to assess attorney's fees but must provide some due process protections).

 Appellants received sufficient notice of the possibility of a sanction at the first evidentiary hearing and through the court's August 3, 1998 order. At the first hearing it was clear that the court was investigating the discussion between Frederick and the receiver at their June 22, 1998 meeting. The court first heard testimony from Marshack and Slack, two of the parties present at the meeting. The court then asked Frederick, the third party at the meeting, to testify. Under the instruction of his newly associated criminal counsel, Frederick refused, asserting his Fifth Amendment rights. At the end of the hearing, the court told the parties it would advise them of its future course of action. It did just that in its August 3, 1998 order. That order stated: "Notice is hereby given that, arising out of the events of June 22, 1998, the Court will consider imposing sanctions and/or surcharges against Frederick J. Hanshaw up to the amount of one million dollars, and/or other appropriate evidentiary or property division sanctions and/or surcharges." Taken together, these actions provided Appellants sufficient notice of the possibility and magnitude of some form of sanction.

Appellants were also afforded a sufficient opportunity to be heard. They were given the opportunity to file briefs on the matter, which they declined to do. More importantly, the district court held a sec-

---

11. The Ninth Circuit has not yet determined by what standard of proof the district court must make its bad faith determination. *See In re Silberkraus,* 253 B.R. 890, 913–14 (Bankr.C.D.Cal.2000). The D.C. Circuit has held that the appropriate standard of proof is clear and convincing evidence. *Shepherd v. ABC, Inc.,* 62 F.3d 1469, 1477 (D.C.Cir.1995). Because the district court here made its finding by clear and convincing evidence, we need not decide whether a lower standard of proof, i.e., a preponderance of the evidence, would be sufficient.

ond hearing to determine whether it would impose sanctions. At that hearing, Appellants were represented by counsel, made arguments, submitted exhibits, presented several of their own witnesses and cross-examined others.

Finally, after conducting two hearings, reading documents, reviewing exhibits and taking numerous hours of testimony, the court made a finding of bad faith by clear and convincing evidence. In sum, the district court provided Appellants sufficient due process to warrant the imposition of a compensatory sanction. *See Roadway Express,* 447 U.S. at 767, 100 S.Ct. 2455.

■ Frederick and Enterprises also argue that the evidence before the district court was insufficient to support the district court's factual finding that Frederick had acted in bad faith. They argue that Frederick was only trying to expedite settlement and encourage the receiver to work overtime. Appellants' argument rests almost entirely upon Frederick's testimony at the second evidentiary hearing. The district court, however, found Frederick's testimony was not credible. The district court also made a factual finding that, at the time of the lunch meeting, resolution of the case was imminent (drafts of the receiver's report and objections thereto had already been filed and a hearing scheduled for July 6). The impending resolution of the case was persuasive evidence disproving Frederick's testimony that he was just trying to expedite settlement and encourage the receiver to work overtime. "The district court has 'broad fact-finding powers' with respect to sanctions, and its findings warrant 'great deference.'" *Batarse,* 115 F.3d at 649 (quoting *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1366 (9th Cir.1990) (en banc)). We conclude that the district court had sufficient evidence to find that Frederick in bad faith attempted to bribe the receiver. *See id.*

Therefore, for the reasons discussed above, Appellants received the due process protections to which they were entitled,

and the district court did not abuse its discretion in awarding $200,000 to Gordon.

## III. Alter Ego Finding

Appellants next argue that the district court erred in ordering that the sanctions be paid by both Frederick and Enterprises. They contend that only Frederick, and not Enterprises, his solely owned corporation, should have been assessed the sanctions because there was no evidence supporting the court's alter ego finding.

■ We need not reach this issue, however, because the district court rested its ruling that Enterprises be liable for the sanctions on two grounds: First, that an alter ego relationship existed between Frederick and Enterprises and, second, that "[i]n attempting to bribe the Court's receiver, Frederick J. Hanshaw acted on his own behalf and also as an agent of his corporation [Enterprises] in attempting to corruptly secure an improper benefit for both himself and his corporation." Appellants do not challenge the court's second basis for holding Enterprises liable. Therefore, even if we disagreed with the court's alter ego finding, Enterprises would still be liable for the $200,000 sanction. *See Branson v. Nott,* 62 F.3d 287, 291 (9th Cir.1995) ("We may affirm the decision of the district court on any basis which the record supports.").

## IV. Recusal Motion

■ Frederick and Enterprises moved to recuse Judge Taylor under 28 U.S.C. § 455. The test under § 455(a) is "'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *United States v. Wilkerson,* 208 F.3d 794, 797 (9th Cir.2000) (quoting *United States v. Hernandez,* 109 F.3d 1450, 1453 (9th Cir.1997)); *see* 28 U.S.C. § 455. Typically, a judge's partiality must be shown to be based on information from extrajudicial sources, although sometimes, albeit rarely, predispositions developed during the course of a trial will suffice.

*See Liteky v. United States,* 510 U.S. 540, 554–55, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In the instance where the partiality develops during the course of the proceedings, it can be the basis of recusal only when the judge displays a deep-seated and unequivocal antagonism that would render fair judgment impossible. *See id.* at 555, 114 S.Ct. 1147.

 Judge McLaughlin concluded that Frederick and Enterprises "ha[ve] not come close" to making a showing that Judge Taylor should be disqualified. We agree. Frederick and Enterprises based their motion entirely upon alleged procedural errors that Judge Taylor made. These alleged errors all occurred in the course of the judicial proceedings and trial administration. They were not based upon knowledge acquired outside the proceedings, nor did they display deep-seated and unequivocal antagonism that would render fair judgment impossible. Judges are known to make procedural and even substantive errors on occasion. The errors alleged here would be the basis for appeal, not recusal. We affirm Judge McLaughlin's denial of the recusal motion.

## V. Inequitable Distribution of Partnership Assets

Appellants argue that the final distribution of partnership assets is inequitable if either the $500,000 or $200,000 sanction is deemed improper. They do not challenge the distribution upon any other ground. To the extent the final distribution of assets was based upon payment of the $500,000 sanction, the district court should adjust the distribution to reflect our vacation of that sanction and the outcome of any further proceedings the court may initiate with respect to imposing such a sanction.

## CONCLUSION

We hold that the $500,000 sanction payable to the United States was criminal in nature and that Frederick and Enterprises did not receive all the procedural protections to which they were entitled. That sanction is therefore VACATED. We hold that the $200,000 payment from Frederick and Enterprises to Gordon was a valid exercise of the court's inherent power and was compensatory and civil in nature, that Frederick and Enterprises received all the procedural protections to which they were entitled and that the record supports the court's finding of bad faith. We further hold that there is no reason to review the alter ego finding because there is an alternative basis for upholding the assessment of liability against Enterprises. We hold that Judge McLaughlin's denial of the recusal motion was proper. Finally, we deny Appellee's motion for attorney's fees because the appeal was not frivolous. *See* Fed. R.App. P. 38. For these reasons, we AFFIRM IN PART and REVERSE IN PART the ruling of the court below. This case is REMANDED to the district court for further proceedings consistent with this opinion. Each party to bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**