**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEROY HAEGER; DONNA HAEGER, husband and wife; BARRY HAEGER; SUZANNE HAEGER, husband and wife,

*Plaintiffs-Appellees*,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation,

*Defendant-Appellant*,

and

SPARTAN MOTORS, INC., a Michigan corporation; GULFSTREAM COACH, INC., an Indiana corporation,

*Defendants*,

v.

ROETZEL & ANDRESS, LPA; BASIL J. MUSNUFF,

*Movants*.

No. 12-17718

D.C. No. 2:05-cv-02046-ROS

LEROY HAEGER; DONNA HAEGER, husband and wife; BARRY HAEGER; SUZANNE HAEGER, husband and wife,

*Plaintiffs-Appellees*,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation,

*Defendant-Appellant*.

No. 13-16801

D.C. No. 2:05-cv-02046-ROS

---

LEROY HAEGER; DONNA HAEGER, husband and wife; BARRY HAEGER; SUZANNE HAEGER, husband and wife,

*Plaintiffs-Appellees*,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation; SPARTAN MOTORS, INC., a Michigan corporation; GULFSTREAM COACH, INC., an Indiana corporation,

*Defendants*,

v.

BASIL J. MUSNUFF,

*Movant-Appellant*.

No. 13-16861

D.C. No. 2:05-cv-02046-ROS

LEROY HAEGER; DONNA HAEGER, husband and wife; BARRY HAEGER; SUZANNE HAEGER, husband and wife,

*Plaintiffs-Appellees*,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation; SPARTAN MOTORS, INC., a Michigan corporation; GULFSTREAM COACH, INC., an Indiana corporation,

*Defendants*,

v.

FENNEMORE CRAIG, P.C.; GRAEME HANCOCK,

*Movants-Appellants*.

No. 13-16862

D.C. No. 2:05-cv-02046-ROS

ORDER AND AMENDED OPINION

Appeal from the United States District Court for the District of Arizona Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted March 10, 2015—San Francisco, California

Filed July 20, 2015 Amended February 16, 2016

Before: J. Clifford Wallace, Milan D. Smith, Jr., and Paul J. Watford, Circuit Judges.

Order;
Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Watford

## SUMMARY[*]

### Sanctions

The panel affirmed the district court's order imposing monetary sanctions against attorneys Basil Musnuff and Graeme Hancock and The Goodyear Tire & Rubber Company, and non-monetary sanctions against Goodyear.

The panel held that it was not an abuse of discretion for the district court to rely on its inherent power to sanction the conduct at issue in this case, and to determine that Fed. R. Civ. P. 37 did not provide the appropriate remedy, especially since the discovery fraud was not discovered until after the cases had settled.

The panel held that it was not abuse of discretion to find that the Sanctionees each acted in bad faith. The panel also held that the district court acted well within its discretion in awarding all the attorneys' fees and costs incurred by the Plaintiffs after Goodyear served its supplemental responses to Plaintiffs' First Request.

The panel held that the district court did not abuse its discretion in imposing non-monetary sanctions on Goodyear.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court's imposition of non-monetary sanctions against Goodyear was balanced, narrowly tailored, and imposed no sanctions beyond what was necessary to remedy what the district court perceived as an ongoing problem in Goodyear's litigation.

Judge Watford dissented. He agreed with the majority that the district court's misconduct findings were supported by the record, but he would nonetheless conclude that the $2.7 million sanctions award must be vacated because Goodyear and its lawyers were not afforded heightened procedural protections before punitive sanctions were imposed.

---

## COUNSEL

Pierre H. Bergeron (argued), Squire Sanders LLP, Cincinnati, Ohio; George Brandon, Squire Sanders LLP, Phoenix, Arizona; Jill G. Okun, Squire Sanders LLP, Cleveland, Ohio, for Defendant-Appellant/Defendant The Goodyear Tire & Rubber Company.

Mark I. Harrison (argued), Jeffrey B. Molinar, Osborn Maledon, PA, Phoenix, Arizona, for Movant/Movant-Appellant Basil J. Musnuff.

Andrew M. Jacobs, (argued), Katherine V. Foss, Snell & Wilmer LLP, Tucson, Arizona; James R. Condo, Lisa M. Coulter, Snell & Wilmer LLP, Phoenix, Arizona, for Movant-Appellant Graeme Hancock.

John J. Egbert (argued), Jennings Strouss & Salmon, PLC, Phoenix, Arizona; David L. Kurtz, The Kurtz Law Firm, Scottsdale, Arizona, for Plaintiffs-Appellees.

**ORDER**

The opinion and dissent filed on July 20, 2015 and published at 793 F.3d 1122 are hereby amended. The amended opinion and dissent are filed concurrently with this order.

With these amendments, Judge M. Smith voted to deny the petitions for rehearing en banc, and Judge Wallace so recommends. Judge Watford voted to grant the petitions.

The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petitions for rehearing en banc are **DENIED**.

Future petitions for panel rehearing and petitions for rehearing en banc will not be entertained.

# OPINION

M. SMITH, Circuit Judge:

On November 8, 2012, after a six-hour evidentiary hearing, and after considering the record in the case and fifteen briefs filed by the potentially-sanctionable parties, then-Chief United States District Judge Roslyn O. Silver, of the United States District Court for the District of Arizona, handed down a sixty-six-page order (Order) imposing sanctions ultimately calculated in the sum of $548,240 against attorney Graeme Hancock (Hancock), and $2,192,961 jointly against attorney Basil J. Musnuff (Musnuff) and The Goodyear Tire & Rubber Company (Goodyear) (collectively the Sanctionees). In the Order, which included forty-nine pages of findings of fact and seventeen pages of legal analysis, Judge Silver found that "there is clear and convincing evidence that sanctions are required to be imposed against [] Hancock, [] Musnuff, and Goodyear. The Court is aware of the unfortunate professional consequences that may flow from this Order. Those consequences, however, are a direct result of repeated, deliberate decisions by [] Hancock, [] Musnuff, and Goodyear to delay the production of relevant information, make misleading and false in-court statements, and conceal relevant documents. [] Hancock, [] Musnuff, and Goodyear will surely be disappointed, but they cannot be surprised."[1]

---

[1] The district court began its order with the following powerful declaration, which warrants the attention of all members of the bar: "Litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When a corporation and its counsel refuse to produce directly relevant information an opposing party is entitled to receive, they have abandoned these basic principles in favor

Because the fraud and deceit practiced on the district court and the Plaintiffs by the Sanctionees was not discovered until after the underlying litigation had been closed and Plaintiffs had settled with Goodyear based upon the incomplete information provided by the Sanctionees, the district court imposed the sanctions in reliance upon its inherent power, and not under Federal Rule of Civil Procedure 11, or 28 U.S.C. § 1927.

The Sanctionees appeal from the judgment awarding the sanctions, arguing that the district court abused its discretion in relying upon its inherent power to impose sanctions, and in determining the amount and the nature of the sanctions imposed.

We affirm both the district court's monetary and non-monetary sanctions imposed against the Sanctionees.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2003, Leroy and Donna Haeger, and Barry and Suzanne Haeger (collectively the Haegers, or Plaintiffs) were all seriously injured when one of the Goodyear G159 tires on the front of their motor home failed while they were driving on a highway, which caused their vehicle to swerve off the road and overturn. The Haegers retained attorney David Kurtz (Kurtz), who filed suit against Goodyear in 2005 in Arizona state court. The case was quickly removed to federal court by Goodyear. Goodyear was represented by Musnuff, who served as Goodyear's "national coordinating counsel" on all G159 cases, and Hancock, who served as Goodyear's local

---

of their own interests.[] The little voice in every attorney's conscience that murmurs *turn over all material information* was ignored."

counsel in Arizona. Musnuff and Goodyear's in-house counsel, Deborah Okey (Okey), were responsible for reviewing and approving all discovery responses in the case.

Before releasing its G159 tire, Goodyear performed FMVSS119 Department of Transportation (DOT) tests, electronic post-production W84 high speed test data (High Speed tests), L04 heat rise test results (Heat Rise tests), DOT endurance tests, crown durability tests, and bead durability tests on the tire. Throughout discovery, the Haegers repeatedly sought the results of Goodyear's tests on the G159 tire. However, as detailed below, Goodyear, Musnuff, and Hancock failed to search for, and/or withheld these relevant and responsive G159 testing documents in violation of their discovery obligations to produce requested relevant documents, and to supplement prior disclosures. *See* Fed. R. Civ. Pro. 26, 34.

Goodyear served its Initial Disclosure Statement on the Plaintiffs on December 15, 2005, pursuant to Rule 26. The initial disclosures did not include testing information, and Kurtz promptly requested that Goodyear produce "[t]esting documentation regarding the G159 tires." Nevertheless, Goodyear did not supplement the disclosures in its Initial Disclosure Statement. Goodyear propounded interrogatories asking for, among other things, "each legal theory under which you believe Goodyear is liable." In response, on August 18, 2006, the Haegers articulated their theory of the case: "Prolonged heat causes degradation of the tire which, under appropriate circumstances, can lead to tire failure and tread separation even when the tire is properly inflated." Additionally, the Haegers stated that when the G159 tire was used on motor homes, the tire produced a level of heat and

degradation "which the tire was not designed to endure, leading to its premature failure."

The Haegers served their First Request for Production of Documents (First Request), pursuant to Rule 34, in September 2006. "Request for Production Number 14" requested "[a]ll test records for the G159 tires, including, but no[t] limited to, road tests, wheel tests, high speed testing, and durability testing." Goodyear objected to this request with a series of boilerplate objections, and failed to produce any documents. However, on November 1, 2006, in its supplemental response to "Request for Production Number 14," Goodyear agreed to produce the FMVSS119 DOT tests for the G159 tire. On December 20, 2006, Kurtz sent Hancock a letter clarifying what had been requested:

> *Request for Production No. 14*. We asked for test records for the G159 275/70R 22.5, including road tests, wheel tests, high speed testing, and durability testing. You objected, suggesting the test records were overly broad and unduly burdensome. You have only produced the DOT test data showing the tires were tested at 30 mph. My interest is in finding the rest of the test data. If there is any, it is your obligation to disclose it.

On January 2, 2007, Hancock wrote an email to Musnuff regarding "Request for Production Number 14," stating:

> We should either respond to any portions of Kurtz' 12.20 letter or figure out that we have a fight on our hands on these points and prepare a counter argument . . . RTP 14. [ . . .]

> [t]est records for all testing on this size G159
> tire. Again, was the only testing at 30 mph or
> less? What speed testing/fleet testing did
> Goodyear rely on? Can/should we supplement
> since his theory is that this tire can't operate at
> 75 mph in the southwest for long periods?

On January 5, 2007, the Haegers's expert witness, David Osborne (Osborne), identified speed as a contributing factor in the G159 tire's failure in his expert report. In response to Osborne's report, Musnuff wrote to Hancock:

> Osborne appears to draw the conclusion that
> the subject tire was only tested at speeds up to
> 30 mph from the fact that the only test data we
> produced is the DOT test data. Of course, our
> discovery response was limited to DOT test
> data because plaintiff had not yet identified
> their defect theory at that time. Now that
> plaintiffs are pinpointing speed as an issue,
> perhaps we need to supplement our discovery
> responses to show the testing of this tire at
> various speeds. Thoughts?

Musnuff also forwarded this email to Goodyear's in-house counsel, Okey, concluding "we should consider supplementing our discovery responses to show the testing of this tire at various higher speeds." Despite Goodyear's understanding of its obligation to supplement its previous discovery responses, they were not supplemented.

Also in January 2007, one of Goodyear's tire engineers located the G159 tire's High Speed tests and Heat Rise tests. It is clear that the engineer delivered at least the High Speed

tests to Musnuff because on February 12, 2007, Musnuff emailed the High Speed tests to Hancock. Neither Musnuff nor Hancock produced these tests to the Haegers. Instead, on April 6, 2007, when Judge Silver asked Hancock "is there any internal documentation that is available that has been requested that your . . . clients have not provided," Hancock responded that Goodyear had "responded to all outstanding discovery . . . if a document shows up, we'll of course produce it and supplement our answers." This response to Judge Silver was false. At the time of this statement, Hancock had been sent the High Speed tests and had stated to Musnuff that they should be produced promptly "given the accusation of no high speed testing in the January report that put that at issue in the case"; it was thus a false representation to state that Goodyear had responded to all outstanding discovery.

Additionally, as a follow up to his receipt of the High Speed tests, Musnuff emailed Goodyear's tire engineer requesting additional data, explaining "if we disclose any of the [High Speed] testing – which is in our best interest – then we need to produce all of it." Despite the fact that these High Speed testing documents were responsive to the Haegers' discovery request, Musnuff was still undecided about whether they were going to be produced.

On May 8, 2007, the Haegers served a Third Request for Production of Documents (Third Request) requesting tests related to whether the G159 tire was suitable for use at a speed of 75 mph. At a discovery dispute hearing on May 17, 2007, Hancock admitted that there were tests available showing that the tire was tested for speeds above 30 mph, but did not mention that Goodyear had been withholding these tests from the Haegers for approximately four months. Instead, Hancock represented that Goodyear would now

produce these tests because of the new obligation arising from the Haegers' Third Request. This was a misrepresentation to the court as Hancock had known that these High Speed tests were responsive to the First Request since February 2007.

On May 21, 2007, Goodyear deposed Osborne, the Haegers' expert witness. Osborne was deposed while under the impression that no high speed testing of the tire had been done. Neither Hancock nor Musnuff disclosed that Goodyear was withholding the High Speed tests. The district court found that taking Osborne's deposition "knowing that Mr. Osborne was operating under incorrect assumptions and an incomplete record," could only have been done "to delay production of the tests in hopes of gaining a tactical advantage."

Goodyear finally produced the High Speed tests on June 21, 2007, again representing that the production was in response to the Third Request, when these tests were actually responsive to the First Request.

On September 13, 2007, Richard Olsen (Olsen), Goodyear's Rule 30(b)(6) witness, testified during a deposition that while additional tests had been undertaken to determine if Goodyear could justify a speed rating of the G159 tire at 75 mph, none of these additional tests was available. Such tests were clearly in addition to the High Speed tests that had been turned over to the Haegers. Shortly after Olsen's deposition, on October 19, 2007, Hancock assured the court that there were no other tests in existence beyond those already produced to the Haegers. Despite the Haegers' demands for production, during pre-trial discovery,

Goodyear disclosed only the FMVSS119 DOT tests and the High Speed tests.

On April 14, 2010, the first day of trial, the Haegers and Goodyear informed the court that they had reached a settlement, and the court closed the case. Based on the information derived from the results of at least one of the Other G159 Cases (discussed below), without having the relevant information in their possession due to the Sanctionees' deceit, the Haegers apparently settled for a small fraction of what they might otherwise have done.

Some time after the case had settled, Kurtz saw an article stating that Goodyear had produced internal heat and speed testing in a separate case involving the G159 tire, and he realized that Goodyear had withheld evidence it was required to produce during discovery. Kurtz filed a motion for sanctions on May 31, 2011. The motion for sanctions argued that Goodyear had engaged in discovery fraud by "knowingly conceal[ing] crucial 'internal heat test' records related to the defective design of the G159." Goodyear's opposition to the motion argued that it "never represented that the DOT test data comprised the totality of testing with regard to the G159 tire." Goodyear further argued:

> Nor did Goodyear ever state or imply that it would produce "all test records for the G159 tires" or identify *all* tests performed on the G159 tires as sought in plaintiffs' initial discovery requests. Rather, Goodyear objected to these requests and stated precisely which test records it agreed to produce, unambiguously indicating that it would not produce *all* test data.

This argument came as a surprise to the district court and it admitted that it "was under the impression that Goodyear had produced *all* test data relevant to Plaintiffs' claims."

On October 5, 2011, finding that there were "serious questions regarding [Goodyear's] conduct in this case," the district court ordered Goodyear to produce "the test results at issue." Goodyear produced the Heat Rise tests, but did not mention any additional tests.

On February 24, 2012, the district court issued a proposed order sanctioning Goodyear based on Goodyear's failure to produce the Heat Rise tests and the repeated representations made by Hancock to the district court that all responsive documents had been produced. The district court's proposed order concluded that the Heat Rise tests should have been produced in response to the First Request. In responding to this proposed order, Goodyear, *apparently by accident*, disclosed the existence of additional G159 tests – the crown durability, bead durability, and DOT endurance tests – none of which had been mentioned or produced in the litigation. The court also discovered that Olsen, Goodyear's Rule 30(b)(6) witness, knew about, but failed to mention, these additional tests at his deposition. The district court held that these tests should also have been produced as responsive to the Haegers' First Request.

The district court held an evidentiary hearing on March 22, 2012, at which both Musnuff and Hancock testified that they had not knowingly engaged in discovery fraud. The district court found their testimonies to be untruthful and unreliable, and held that "Mr. Hancock, Mr. Musnuff, and Goodyear engaged in repeated and deliberate attempts to frustrate the resolution of this case on the merits."

In its Order, the district court reviewed Goodyear's discovery responses in certain other G159 tire failure actions (collectively the Other G159 Cases) against Goodyear in order to compare what the Sanctionees knew, and when they knew it, with regards to the G159 tests.[2] In *Woods v. Goodyear*, No. CV 04-45 (Circuit Court of Hale County, Alabama), in August 2007, a Goodyear employee informed Musnuff that in addition to the High Speed tests, the tests used to determine the suitability of the G159 to be driven at 65 mph included FMVSS119 DOT tests, Heat Rise tests, bead durability tests, crown durability tests, W16 tests, W64 tests, G09 tests, and L04 tests. In *Schalmo v. Goodyear*, No. 51-2006-CA-2064-WS (Fla. Cir. Ct., 6th Cir., Pasco County), in April 2008, Musnuff and Goodyear produced the Heat Rise tests in response to a request to produce tests associated with speed rating. Musnuff wrote an email in May 2009 stating that the *Schalmo* plaintiffs "highlighted the Heat Rise testing taken during the durability testing of the G159." This case ended in a plaintiff's verdict of $5.6 million. Finally, in *Bogaert v. Goodyear*, No. CV 2005-051486 (Sup. Ct. of Maricopa County, Arizona), in response to an order from the court to produce testing of the G159 tire's suitability at 65 mph, Musnuff emailed Hancock in June 2008 stating that the whole suitability testing package included: (1) the extended DOT tests, (2) the Heat Rise tests, (3) the bead durability tests, and (4) the crown durability tests. As in this case, in each of the Other G159 Cases, Goodyear engaged in lengthy discovery battles with the plaintiffs before it produced the requested documents. *Woods* and *Bogaert* were

---

[2] The district court considered Hancock, Musnuff, and Goodyear's conduct in the Other G159 Cases for the purpose of assessing credibility, and determining the actors' state of mind. It expressly did not base its sanctions on the Sanctionees' conduct in the Other G159 Cases.

ultimately settled, but the amount of the settlements is either held under seal, or not reflected in the record of those cases. As stated above, presumably with the benefit of the Heat Rise tests, *Schalmo* yielded a $5.6 million verdict to the plaintiffs.

The district court considered each of the Sanctionees' conduct in the Other G159 Cases in light of their conduct in the present case, and concluded that "Goodyear and its counsel took positions in other G159 cases directly contrary to the positions they now ask this Court to accept. The positions taken in these other cases, when Goodyear and its counsel were not attempting to avoid sanctions, are reliable."

The district court concluded that sanctions under 28 U.S.C. § 1927 could not reach Goodyear's conduct, and that sanctions pursuant to Rule 11 were unavailable as they should be imposed before a case is closed. Accordingly, relying upon its inherent power, the district court determined that the most appropriate sanction for "remedying a years-long course of misconduct" would be "to award Plaintiffs *all* of the attorneys' fees and costs they incurred after Goodyear served its supplemental responses to Plaintiffs' First Request." The district court held that the supplemental responses, in which Goodyear only produced the FMVSS119 DOT tests, "was the first definitive proof that Goodyear was not going to cooperate in the litigation process." The court also noted that while it would be impossible to determine how the litigation would have proceeded if Goodyear had made the proper disclosures, the case more likely than not would have settled much earlier, and the Haegers believe, for considerably more money.

The district court then conducted an exhaustive analysis of the documentation submitted by Plaintiffs concerning the

time entries of its attorneys after Goodyear served its supplemental responses to Plaintiffs' First Request, and the extensive objections made by Goodyear and its counsel to these time entries. The district court "spent considerable time reviewing *each* time entry and its associated objections in an attempt to ensure the appropriate size of the award," and with painstaking attention to detail, made adjustments based on Goodyear's objections. Ultimately, using the lodestar method, the district court found that the Haegers should be reimbursed $2,741,201.16 in attorneys' fees and costs. The district court determined that Hancock would be responsible for twenty percent of these fees and costs "[b]ased on his relatively limited involvement, but in light of his repeated misstatements and his failure to correct the record once he learned his representations were false." Musnuff and Goodyear were held jointly responsible for the remaining eighty percent of the fees and costs.

The district court also ordered Goodyear "to file a copy of this Order in any G159 case initiated after the date of this Order," with a footnote indicating that "Goodyear may apply to the court hearing the case to be excused from this requirement." The district court concluded that such filings were necessary based on Goodyear's history of engaging in discovery misconduct during every G159 case that had been brought to the court's attention. The court reasoned that by filing the Order in future G159 cases, Goodyear would "alert plaintiffs and the courts" that it has not acted "in good faith in the past when litigating such cases," and give notice of the tests Goodyear had "attempted to conceal in previous cases."

## STANDARD OF REVIEW AND JURISDICTION

"The district court's award of sanctions and the amount of the award are reviewed for abuse of discretion." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991)). Since imposing a sanction under its inherent authority "is within the sound discretion of the district court, we will not overturn its decision unless the court committed an error of law or the court's factual determinations were clearly erroneous." *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109 (9th Cir. 2005).

We need not resolve whether a bad faith finding must be supported by clear and convincing evidence, or whether a lesser quantum of evidence suffices, because the district court did not abuse its discretion in finding clear and convincing evidence of bad faith by the Sanctionees in this case. *See Lahiri v. Universal Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).

We have jurisdiction over the Sanctionees' appeals pursuant to 28 U.S.C. § 1291.

## DISCUSSION

## I.   The District Court's Inherent Power

"It has long been understood that [c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution, power which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal citations and quotation marks omitted). The

Supreme Court has specifically recognized that the "inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question." *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946) (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 332 U.S. 238 (1944)).

This inherent power is not limited by overlapping statutes or rules. The Supreme Court explained "that the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 49. Thus, the Sanctionees' argument that the district court should have relied on Federal Rule of Civil Produce 37 fails.[3] While

---

[3] Rule 37 provides that "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." If the party fails to comply with a court order, Rule 37 provides the following remedies: Rule 37(b)(2)(A) "If a party . . .fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders. They may include the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination"; Rule 37(b)(2)(C) "Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Rule 37 also provides a method to sanction a party for failing to comply with discovery rules, it is not the exclusive means for addressing the adequacy of a discovery response. *See id.*

The Sanctionees also argue that the court cannot impose sanctions in this case because the Haegers failed to move to compel disclosure or discovery under Rule 37, and thus the Sanctionees never violated a district court order compelling disclosure or discovery. More specifically, the Sanctionees contend that absent such a motion to compel or order requiring production, Goodyear and its counsel complied with discovery rules, and thus the district court does not have power to sanction the Sanctionees' conduct. The Supreme Court has expressly rejected this argument. "[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules . . . if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id*. at 50. We hold that it was not an abuse of discretion for the district court to rely on its inherent power to sanction the conduct at issue in this case, and to determine that Rule 37 did not provide the appropriate remedy, especially since the discovery fraud was not discovered until after the case had settled.

---

Additionally, if a party fails to disclose or supplement an earlier response, Rule 37(c)(1) states: "If a party fails to provide information . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions . . . ."

## A.  Bad Faith

Before awarding sanctions pursuant to its inherent power, "the court must make an express finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006). We have found bad faith in a variety of conduct stemming from "a full range of litigation abuses." *Chambers*, 501 U.S. at 47. For example "[a] party 'demonstrates bad faith by delaying or disrupting the litigation . . . .' *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)." *Leon*, 464 F.3d at 961 (plaintiff demonstrated bad faith by going to extraordinary measures to destroy evidence).

Actions constituting a fraud upon the court or actions that cause "the very temple of justice [to be] defiled" are also sufficient to support a bad faith finding. *Chambers*, 501 U.S. at 46. For example, in *Pumphrey v. K.W. Thompson Tool Company*, the decedent's family brought a wrongful death action against a gun manufacturer after the decedent dropped the manufacturer's gun with the safety devices engaged and it fired, killing the decedent. 62 F.3d 1128, 1130 (9th Cir. 1995). During trial, the manufacturer introduced tests showing that when the gun was dropped, the safeties performed as designed and the gun never fired. *Id*. After the trial concluded, Plaintiffs' attorney learned that in a subsequent, unrelated lawsuit, the manufacturer had produced tests during which the gun had fired when dropped. *Id*. These tests had not been produced during Plaintiffs' litigation even though they were available two months before trial, and despite the manufacturer's assurance that gun tests would be made available upon their discovery. *Id*. at 1131. The manufacturer also affirmatively mischaracterized the nature of these tests during later discovery, and introduced testimony

during trial that it had never seen the gun fire when dropped. *Id*. at 1132. Plaintiffs moved to set aside the trial verdict, pursuant to Federal Rule of Civil Procedure 60(b). *Id*. at 1130. We upheld the district court's grant of a new trial finding that the manufacturer had "engaged in a scheme to defraud the jury, the court, and [the Plaintiffs], through the use of misleading, inaccurate, and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct the false impressions created . . . ." *Id*. at 1132. We further held that the "end result of the scheme was to undermine the judicial process, which amounts to fraud upon the court." *Id*. (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 332 U.S. 238, 245–46, 250 (1944) (deliberately planned scheme to present fraudulent evidence constitutes fraud upon the court); *Abatti v. C.I.R.*, 859 F.2d 115, 118 (9th Cir. 1988) (fraud upon the court involves unconscionable plan or scheme to influence the court improperly)). While the procedural posture of *Pumphrey* differs from the one in this case, the similarities with this case support the conclusion that the district court did not abuse its discretion in concluding that Sanctionees engaged in fraud upon the court in their scheme to avoid their discovery obligations.

In *B.K.B. v. Maui Police Department*, we found "counsel's reckless *and* knowing conduct" to be "tantamount to bad faith and therefore sanctionable under the court's inherent power." 276 F.3d 1091, 1108 (9th Cir. 2002) (emphasis in original). *B.K.B.* was a sexual harassment suit, in which defense counsel introduced testimony in violation of

Federal Rule of Evidence 412.[4] Defense counsel introduced this testimony after two Rule 412 pre-trial motions had been denied, and after he assured the district judge in a sidebar that the anticipated testimony would not violate Rule 412. *Id*. at 1107. We concluded that "defense counsel's introduction of [the] testimony was a knowing and intentional violation of Rule 412" and further held that "[i]f left unsanctioned, defense counsel's behavior in this case would undermine the very purpose and force of Rule 412's strictures." *Id*. at 1108. In this case, the district court did not abuse its discretion in concluding that the Sanctionees' failure to produce relevant documents despite their affirmative obligations to do so pursuant to Rules 26 and 34, and their misrepresentations in numerous discovery disputes (which the district court estimated took "approximately sixteen hours in court"), was tantamount to bad faith. The Sanctionees' conduct in this matter undermines the very purpose of the federal rules requiring disclosure of relevant and responsive documents.

It is clear the district court did not abuse its discretion in concluding that Hancock, Musnuff, and Goodyear acted in bad faith in this litigation. The Sanctionees, throughout numerous discovery dispute filings and hearings, convinced the district court that Goodyear had produced all test data relevant to the Haegers' claims. The district court noted that "[i]n fact, at various points the Court became exasperated with Plaintiffs' apparently unsubstantiated claims that additional information must exist." It was not until the

---

[4] Rule 412: "(a) Prohibited Uses. The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct: (1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition."

sanctions proceedings that the district court realized that the Sanctionees had

> adopted a plan of making discovery as difficult as possible, providing only those documents they wished to provide, timing the production of the small subset of documents they were willing to turn over such that it was inordinately difficult for Plaintiffs to manage their case, and making false statements to the Court in an attempt to hide their behavior.

The Haegers served their First Request in September 2006. The Sanctionees merely objected to this request, and did not produce any documents. The Sanctionees then filed supplemental responses in November 2006, which included the production of only one group of tests – the FMVSS119 DOT tests. It was not an abuse of discretion for the district court to find that production of just one group of tests meant that the Sanctionees had failed to search properly for relevant G159 tests in response to the Haegers' First Request, and had done so in bad faith.

The Sanctionees then failed to disclose promptly relevant G159 tests after a proper search had been conducted. Musnuff and Hancock had the High Speed tests in their possession at the latest in February 2007, yet failed to disclose promptly the High Speed tests to the Haegers. Instead, the Sanctionees chose to depose the Haegers' expert in May 2007, and then produce the High Speed tests in June 2007. Musnuff was next aware of more tests – including the Heat Rise tests, DOT endurance tests, crown durability tests, and bead durability tests — at least by August 2007, and Hancock was aware of these same tests at least by June 2008. However, the

Sanctionees again failed to disclose properly these tests upon their discovery. Without producing any of these additional tests, Goodyear settled with the Haegers in April 2010.

The district court concluded that the Sanctionees should have turned over the High Speed tests, Heat Rise tests, DOT endurance tests, crown durability tests, and bead durability tests as soon as they were discovered, as they were all responsive to the First Request. The district court did not abuse its discretion in concluding that this decision to withhold documents "was a bad faith attempt to hide responsive documents," which would not have been uncovered but for the sanctions proceedings. This finding of bad faith is bolstered by Hancock's repeated representations to the district court that Goodyear was complying with all discovery requests when in fact, Goodyear was withholding relevant and responsive documents.

Any attempt by Goodyear to argue that the district court abused its discretion in preventing Goodyear from passing the blame on to its attorneys is unavailing. Goodyear "is deemed bound by the acts of [its lawyers] and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962); *see also Lockary v. Kayfetz*, 974 F.2d 1166, 1169–70 (9th Cir. 1992). Additionally, the district court did not abuse its discretion in concluding that Goodyear participated directly in the discovery fraud: Goodyear's Rule 30(b)(6) witness, authorized to testify on Goodyear's behalf, falsely testified during deposition that no additional tests were available beyond the High Speed tests that had been turned over to the Haegers; and Goodyear's in-house counsel, Okey, maintained responsibility for reviewing and approving all the incomplete and misleading discovery responses.

We hold that it was not an abuse of discretion for the district court to find that Hancock, Musnuff and Goodyear each acted in bad faith.

### B.  Monetary Sanctions

Once a district court makes a finding of bad faith, it has the discretion to "award sanctions in the form of attorneys' fees against a party or counsel.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process*." Chambers v. NASCO*, 501 U.S. 32, 44–45 (1991).

In its analysis of sanctions, the district court noted that due to the extent of the bad faith of the Sanctionees in this case, had the misconduct "come to light while the case was ongoing, entry of default judgment with a trial on damages would have been the obvious solution." However, since the case was settled and closed before the misconduct was discovered, the court instead was faced with the task of determining the appropriate amount of sanctions to make the Plaintiffs whole in the form of attorneys' fees and costs. The court found that the Sanctionees had engaged in a "years-long course of misconduct," which had made it difficult for the court to "separate the fees incurred due to legitimate activity from the fees and costs incurred due to Goodyear's refusal to abide by clear and simple discovery obligations." The court explained that "if Goodyear had responded to Plaintiffs' First Request with all responsive documents, Goodyear might have decided to settle the case immediately," and thus it was possible to "conclude practically all of Plaintiffs' fees and costs were due to misconduct." The district court concluded

that "[w]hile there is some uncertainty how the litigation would have proceeded if Goodyear and its attorneys were acting in good faith, based on Goodyear's pattern and practice in G159 cases, the case more likely than not would have settled much earlier." Thus the district court was informed in part by past settlement practices of Goodyear in the Other G159 Cases in reaching its determination concerning appropriate compensatory damages in this case. The district court then determined, relying upon the reasoning in *Chambers*, that while "[i]t is difficult to reconcile *Chambers* with . . . *Miller*," "the most appropriate sanction is to award Plaintiffs all of the attorneys' fees and costs they incurred after Goodyear served its supplemental responses to Plaintiffs' First Request" as this "was the first definitive proof that Goodyear was not going to cooperate in the litigation process." The district court held that "in these unique circumstances, it is inappropriate to limit the award to the fees and costs that could be directly linked to the misconduct; proving that linkage is an almost impossible task given how the misconduct permeated the entirety of this case."

The Sanctionees claim that this determination was made in error because sanctions must be directly linked to damage caused by its bad faith conduct, citing *Miller v. City of Los Angeles*, 661 F.3d 1024, 1029 (9th Cir. 2011). The Sanctionees' confidence in *Miller* is misplaced, for at least two reasons: (1) to the degree *Miller* can be read to require that the specific amount of attorneys' fees and costs awarded when a court invokes its inherent powers must be directly linked to the bad faith conduct, it flouts controlling United States Supreme Court case law; and (2) under *Chambers*, the district court did all it was required to do in this case in determining the appropriate amount of fees to award as

sanctions to compensate the Plaintiffs for the damages they suffered as a result of Sanctionees' bad faith.

The panel majority's opening paragraph in *Miller* characterized the case as follows: "This is a strange case. Its resolution hinges on the absence, as a factual matter, of something we must accept as a legal matter. There are unlikely to be many more like it, so this opinion's precedential value is probably limited." *Id.* at 1026. What was missing? The answer: bad faith, an essential requirement for invoking the district court's inherent powers. *Miller* was a wrongful death suit brought against the City of Los Angeles, its police department, police chief, and a sergeant who shot and killed the decedent. The district court "issued an in limine order precluding defendants from arguing that the decedent was armed when he was shot." *Id.* at 1026. The district court found that during the trial's summation, defense counsel violated its in limine order by stating that before decedent was shot, decedent had shot another man, and awarded sanctions under its inherent power for the entire cost of the trial after the jury hung. Counsel conceded that he had violated the court's order, and even apologized for his error, but the district court nevertheless construed counsel's conduct as "tantamount to bad faith," granted plaintiffs' motion for sanctions, and sanctioned defendants $63,687.50. *Id*. There was just one problem. A careful review of the record showed that counsel hadn't actually violated the court's in limine order, despite his confession that he had done so. That put the majority of our panel into a quandary. What should one do about a lawyer who confesses a non-existent error? In this case, the panel majority concluded that it was bound by what the lawyer had confessed, but that since the lawyer had not conceded bad faith, and clearly had not actually violated the court's order, there could be no finding of bad faith. Put

another way, "you can't have a bad faith violation without a violation." *Id.* at 1029. The case was over, since a district court cannot use its inherent power to sanction a party without a finding of bad faith.

But even the subsequent analysis in *Miller* is of little help to the Sanctionees here. *Miller* addressed whether the district court linked the alleged bad faith conduct to the harm suffered, i.e, whether the district court found that the attorney's alleged statement caused the jury to hang. The panel concluded that "without a finding that [defense counsel's violation] caused the first jury to hang, the district court had no power to order defendants to compensate plaintiffs for the attorneys' fees and costs they spent on the first trial." *Id*. Thus, while *Miller* suggests that harm is necessary to compensate a party, *Miller* makes no holding on the measure of attorneys' fees allowed once it is clear that the bad faith of a party has actually caused harm. [5] In this case, however, there is no doubt that the Sanctionees' bad faith conduct caused significant harm in forcing the Haegers to engage in sham litigation, and in their likely foregoing millions of dollars in the settlement they accepted under false pretenses of the Sanctionees, as found by the district court in light of Goodyear's conduct in the Other G159 Cases.

---

[5] *In re Dyer*, 322 F. 3d 1178 (9th Cir. 2003), also cited by the panel, involved the violation of an automatic stay in bankruptcy, and a purported sanctions award based on the bankruptcy court's statutory contempt power, granted by 11 U.S.C. §105(a). Our panel found that a bankruptcy court has no authority to impose a non-compensatory "serious punitive" sanction. *Id*. at 1195. This holding, of course, has no bearing on this case. *B.K.B. v. Maui Police Dep't*, 276 F. 3d 1091, 1109 (9th Cir. 2002) also referenced by the *Miller* panel, is discussed *infra*.

Even though *Miller* does not provide an answer, we next consider how close  a link is required between the harm caused and the compensatory sanctions awarded when a court invokes its inherent power. The question is squarely answered by *Chambers v. NASCO, Inc.*, the Supreme Court's strongest statement about the use of a court's inherent power. 501 U.S. 32 (1991). In *Chambers*, the Supreme Court upheld a district court's determination that "full attorney's fees were warranted due to the frequency and severity of [the party]'s abuses of the judicial system." 501 U.S. at 56. The underlying action in *Chambers* was a suit by NASCO seeking Chambers's specific performance of an agreement to sell a television station's facilities and broadcast license to NASCO. Chambers responded to the suit by attempting to put the properties at issue beyond the reach of the district court through various transfers, ignoring the district court's preliminary injunction, filing meritless motions and pleadings, attempting to conduct depositions in violation of the Federal Rules of Civil Procedure, and engaging in other behavior aimed at frustrating the possibility of specific performance. The district court found these actions to be "part of a sordid scheme of deliberate misuse of the judicial process designed to defeat NASCO's claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources." *Id*. at 57 (internal quotation marks omitted).

The district court then awarded NASCO an amount "which represented the entire amount of NASCO's litigation costs paid to its attorneys." *Id*. at 40. The Supreme Court dismissed Chambers's argument, which was virtually identical to the causation requirement claim the Sanctionees are making in this case, that "the fact that the entire amount of fees was awarded means that the District Court failed to

tailor the sanction to the particular wrong," and instead upheld the district court's conclusion "that full attorney's fees were warranted due to the frequency and severity of Chambers's abuses of the judicial system and the resulting need to ensure that such abuses were not repeated." *Id*. at 57. The Supreme Court further explained that it was within the district court's discretion to "compensate NASCO by requiring Chambers to pay for all attorney's fees." *Id*. The Supreme Court reasoned that the district court "imposed sanctions for the fraud [Chambers] perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of litigation." *Id*. at 55 (internal citations and quotation marks omitted). And, such sanctions both "vindicat[e] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[e] the prevailing party whole for expenses caused by his opponent's obstinacy." *Id*. at 46 (internal citation and quotation marks omitted); *see also Hutto* v. *Finney*, 437 U.S. 678, 691 (1978). As a United States Supreme Court case, *Chambers* clearly trumps *Miller*, to the degree *Miller*'s dicta conflicts with *Chambers*, as well as any other Ninth Circuit case to the contrary. Thus, even though the district court in this case struggled with how to reconcile *Miller* with *Chambers*, it appropriately awarded the Haegers all their attorneys' fees and costs in prosecuting the action once the Sanctionees began flouting their clear discovery obligations and engaging in frequent and severe abuses of the judicial system.

Given the teaching of *Chambers*, the district court's findings and ruling in this case regarding monetary sanctions fully comply with law. First, the Supreme Court expressly rejected the linkage argument made by the Sanctionees here when it upheld the award for full attorney's fees "due to the

frequency and severity of Chambers's abuses of the judicial system and the resulting need to ensure that such abuses were not repeated." *Chambers*, 501 U.S. at 57. Secondly, it made clear that we review the district court's determinations in arriving at the proper measure of compensatory damages for abuse of discretion. *Id.*

The district court here used the lodestar method to calculate the appropriate amount of fees incurred as a result of the Sanctionees' bad faith, and noted that this "method contemplates multiplying the 'reasonable hourly rate' by the number of hours 'reasonably expended.' *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996)." The district court then went to great lengths in reviewing the "240 pages of time entries" submitted by the Haegers, and the combination of objections by Goodyear and its attorneys to "[a]lmost every time entry" to ensure "the appropriate size of the award." In a nineteen-page order, the district court addressed each objection made by the Sanctionees to the court's proposed award, and made five adjustments based on these objections: 1) "out of an abundance of caution," the district court imposed a twenty percent reduction of $29,310 for recreation of time entries; 2) the district court held that because some of the time entry descriptions were vague and/or incomplete, it could not conclude that this time was reasonably expended absent the appropriate information, and reduced the award by $32,117; 3) the district court reduced the award by $4,880.73, equaling the costs for which the Haegers did not submit supporting documents; 4) the district court subtracted $50,721 for time entries involving work of a clerical nature; and 5) the district court found that $25,827.50 should be reduced for excessive billing. Applying these adjustments, the district court awarded the amount the court reasonably believed it cost the Haegers to

litigate against a party and attorneys during the time when that party and those attorneys were acting in bad faith. Nothing more is required under *Chambers* or our case law, and, especially given the great care with which the court reviewed the relevant data during its consideration of legal fees, the court clearly did not abuse its discretion.

Our dissenting colleague suggests that *Chambers*'s control over this case was undermined by *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821(1994), and our own *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc*., 244 F. 3d 1128 (9th Cir. 2001). He also suggests that the district court's sanctions in this case were punitive, not compensatory. With due respect, our colleague is mistaken on both counts. *Bagwell* involved a criminal contempt proceeding stemming out of a protracted labor strike, in which a union was found to have violated the trial court's orders hundreds of times, as determined in eight separate contempt hearings. Although the trial court labeled the over $64 million it levied in fines against the union "civil and coercive," *Bagwell*, 512 U.S. at 824, once the union and the companies settled their labor dispute, and moved to vacate the contempt fines, the trial judge refused to do so, declaring that they were "payable in effect to the public." *Id*. at 825. The Supreme Court appropriately treated the fines as punishment for "criminal contempt," and required courts to provide additional protections to the defendants in such cases. *Id*. at 826. However, even though *Chambers* had been decided only 3 years before by the Supreme Court, *Bagwell* did not even mention *Chambers*, let alone overrule or distinguish it. Contrary to the facts in this case, the Court noted:

> [N]either any party nor any court of the Commonwealth has suggested that the challenged fines are compensatory. At no point did the trial court attempt to calibrate the fines to damages caused by the union's contumacious activities or indicate that the fines were to compensate the complainant for losses sustained. The nonparty governments, in turn, never requested any compensation or presented any evidence regarding their injuries, never moved to intervene in the suit, and never actively defended the fines imposed.

*Id*. at 834 (internal citation and quotation marks omitted).

*F.J. Hanshaw*, also cited by our dissenting colleague, is extremely helpful in confirming the validity of the compensatory damages awarded in this case. *F.J. Hanshaw* involved a dispute between two wealthy brothers about a partnership dissolution. 244 F.3d at 1132. Just as a court-appointed receiver was about to render an accounting to the court, one of the brothers, Frederick J. Hanshaw (FJH), allegedly offered the receiver a bribe of $100,000, as well as future business. *Id*. at 1132–33. When the attempted bribe came to the attention of the district court, the court referred the matter to the FBI, which, after conducting several interviews, decided not to proceed with formal criminal charges against FJH. *Id*. at 1133. Thereafter, the district court conducted two evidentiary hearings to determine whether FJH had attempted to defraud the court and his brother. *Id*. at 1133–34. After weighing the evidence, the court concluded that there had been an attempt by FJH to bribe the receiver, and sanctioned FJH and his corporation $500,000, payable to

the United States, and imposed a $200,000 sanction against them in favor of his brother, Gordon Hanshaw (GH). *Id*. at 1135. Relying on *Bagwell*, our court found that the $500,000 sanction was "clearly punitive and intended to vindicate the court's authority and the integrity of the judicial process. The sanction was a substantial 'flat, unconditional fine'; was not intended to compensate [GH] but rather was made payable to the United States . . . ." *Id*. at 1138. Since the $500,000 sanction was found to be punitive in nature, we reversed the district court because FJH and his corporation did not receive all the procedural protections to which they were entitled. *Id*. at 1139–40, 1145.

However, we upheld the district court's $200,000 sanction in favor of GH, despite FJH's contention that it too was criminal in nature and should be vacated. *Id*. at 1142, 1145. We noted that: (a) "[u]nlike a punitive sanction, particularly one that is payable to the government or the court, a compensatory award payable to a party does not place the court in a prosecutorial role"; (b) "[w]hen determining whether and how much to compensate a party, the court sits in the same adjudicatory position it does when it resolves most disputes. Although the court has an institutional interest in the matter, the court in essence is resolving a dispute between litigants: one party claims it was wronged by the other and wants to be reimbursed by the losses it sustained. For these reasons, when the court is adjudicating a compensatory civil sanction, the traditional procedural protections applicable to civil proceedings are sufficient to satisfy the Constitution's requirement of due process"; (c) in concluding that the $200,000 award to GH was compensatory, we reasoned that "[t]he award was payable to [GH] . . . and was meant to offset the expenses he incurred because of [FJH's] misconduct. As a result of the

bribe attempt, the entire receivership process was delayed by nearly six months and [GH] was forced to incur additional attorney fees. The court had before it the billing reports from [GH's] attorneys and [GH] had asked the court for $824,000 in compensation . . . . Exercising its discretion, the court awarded $200,000 to [GH]"; and (d) "[b]ased upon this record, we conclude that the $200,000 award was intended to compensate [GH] for losses sustained as a result of [FJH's] misconduct and is civil in nature." *Id*. at 1142 (citing *Chambers*, 501 U.S. at 56–58).

Just like the district court did in *F.J. Hanshaw* in its $200,000 award to GH, the court here responded to a complaint filed by the Plaintiffs seeking damages for the Sanctionees' bad faith, and awarded as compensatory damages the amount of the attorneys' fees and costs it carefully determined the Haegers had actually incurred litigating against the Sanctionees, during the time they were acting in bad faith.

"[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved," meaning a civil sanction is "for the benefit of the complainant," while a criminal sanction is "punitive, to vindicate the authority of the court." *Bagwell*, 512 U.S. at 827–28 (internal quotations omitted). A fine is almost always civil it if "compensate[s] the complainant for losses sustained," *Id.* at 829 (internal quotations omitted), whereas it is generally punitive in nature when it "was not intended to compensate [the party] but rather [is] made payable to the United States." *F.J. Hanshaw*, 244 F.3d at 1138. Other Ninth Circuit cases affirm these points. In *B.K.B. v. Maui Police Department*, the district court found that the sanctionees had acted in bad faith in violating the Federal Rules of Evidence while questioning a

witness about the Plaintiff during trial, and awarded "$5,000 to compensate Plaintiff for the pain and suffering caused by the public embarrassment resulting from [the] testimony." 276 F.3d 1091, 1099 (9th Cir. 2002). We upheld the sanction, holding that "the amount the court imposed reflected its assessment of the actual harm incurred by Plaintiff . . . [in] emotional and reputational damage." *Id*. at 1109. Because the district court imposed the sanctions for the purpose of compensation, they were within its discretion.

The district court in *Lasar v. Ford Motor Company* imposed monetary sanctions to compensate "for unnecessary costs and attorney's fees." 399 F.3d 1101, 1111 (9th Cir. 2005). In *Lasar*, the sanctionees' attorney violated pretrial orders during his opening statement, and the court granted Lasar's motion for mistrial and discharged the jury. *Id*. at 1106. The district court then instructed "Lasar's attorneys to prepare an affidavit detailing Lasar's costs and attorney's fees incurred over the previous two weeks." *Id*. While it is unclear why the district court determined that Lasar should be compensated for two weeks of attorney's fees, the sanctions were upheld as we determined that "[t]he monetary sanctions imposed . . . were compensatory in nature because they were designed to compensate Lasar for unnecessary costs and attorney's fees." *Id*. at 1111. Thus, it was within the district court's discretion to determine the time frame in which Lasar sustained "losses."

Collectively, these cases make clear that the sanctions awarded here were entirely lawful and appropriate. Not one dime was awarded to the government or the court. Just like the district court in *F.J. Hanshaw*, the district court here awarded compensatory damages after the aggrieved party filed suit, or filed a motion, seeking compensation for

damages suffered as a result of the bad faith of the opposing party. In awarding compensatory damages, the district court did not act as a prosecutor, but instead allowed the accused and accusing parties to file extensive briefs, and held extensive hearings to determine the truth of what had happened. It took great care in parsing and reducing the attorney fee claims of the Plaintiffs. The accused were granted full due process and afforded all the protections required in civil sanctions hearings. While the district court had an institutional interest in the proceedings (just like the district court did in *F.J. Hanshaw*), its stated purpose was to properly compensate the Plaintiffs for damages they suffered as the result of the Sanctionees' fraudulent conduct.  In sum, the district court acted well within its discretion in awarding all the attorneys' fees and costs incurred by the Plaintiffs after Goodyear served its supplemental responses to Plaintiffs' First Request.

## C.  **Non-Monetary Sanction**s

The district court also used its inherent power to order Goodyear to file a copy of the Order in any G159 case initiated after the date of that Order. The district court reasoned that "[b]ased on Goodyear's history of engaging in serious discovery misconduct in every G159 case brought to this Court's attention, filing this Order in future G159 cases will alert plaintiffs and the courts that Goodyear has, in the past, not operated in good faith when litigating such cases." The district court found that this would "serve as a notice of the existence of certain tests Goodyear attempted to conceal in previous cases." The district court did not limit this requirement in either time or scope. Goodyear argues that this sanction is too severe as it impacts the fairness of unrelated

proceedings, and thus should be reversed as an abuse of the district court's discretion.

Courts have the inherent power to impose various non-monetary sanctions. *See Thompson v. Hous. Auth. of Los Angeles*, 782 F.2d 829, 831 (9th Cir. 1986) (inherent power includes power to "impose sanctions including, where appropriate, default or dismissal"); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (dismissal pursuant to inherent powers); *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162 (9th Cir. 2012) (affirming order striking answer and entering default judgment). However, even if a given sanction is available, the scope of the sanction must also be appropriate. *Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1558 (9th Cir. 1996). A sanction should be "carefully fashioned to deny [the party] the fruits of its misconduct yet not to interfere with [the party's future rights]." *Id*.

In *Hale v. U.S. Trustee*, a bankruptcy court imposed a sanction that regulated future conduct "in response to specific and repeated acts of incompetent and irresponsible representation." 509 F.3d 1139, 1149 (9th Cir. 2007). The court found a bankruptcy attorney to be "[u]nable or unwilling to conform his conduct to the requirements established by the Court's prior decisions and ruling, and to the standards by which all other debtors' counsel in the District abide." *Id*. at 1145. We upheld the bankruptcy court's sanction which required that the attorney "not file, nor shall he prepare or cause to be prepared for filing by a debtor, any bankruptcy petitioner unless [the attorney] signs said petition." *Id*. Additionally, the attorney was directed not to file, nor assist a debtor as counsel in filing, "any bankruptcy petition unless [the attorney] commits to such debtor to meet

the ethical and professional obligations of a debtor's attorney and provide the reasonable and necessary services required to properly represent a debtor in a bankruptcy case." *Id*. Thus, this chosen sanction regulated the attorney's practice and specific actions that the attorney was required to take with all future clients. We held that "[u]nder the specific acts of this case, we cannot say that the bankruptcy court abused its inherent power to impose sanctions." *Id*. at 1149.

We are persuaded by the reasoning of *Hale*. We are also persuaded by the reasoning of *Gallop v. Cheney*, a Second Circuit case addressing the same issue. 667 F.3d 226 (2d Cir. 2012). The Plaintiff's claims in *Gallop* were dismissed by the district court as frivolous, and the Second Circuit affirmed the dismissal on appeal. *Id*. at 228. The Second Circuit then ordered Plaintiff and her counsel, including Dennis Cunningham, to show cause why the Court should not impose sanctions for what it held to be a frivolous appeal. In response, Plaintiff moved to "disqualify the three members of the panel from considering her petition for rehearing and rehearing in banc." *Id*. The Court sanctioned Plaintiff's counsel for filing a frivolous appeal, and then imposed additional sanctions for filing the frivolous motion to disqualify. *Id*. at 230. The Court held that "Cunningham acted in bad faith in demanding the recusal of the three panel members and any like-minded colleagues," and ordered Cunningham to "provide notice of the sanctions imposed upon him in this case . . . to any federal court in this Circuit before which he appears or seeks to appear" for a period of one year. *Id*.

The district court here imposed the non-monetary sanction so that future plaintiffs and courts would be alerted that Goodyear had previously not operated in good faith, and

so that future plaintiffs would be aware of the types of G159 tests available. We agree with the district court's reasoning, particularly in light of the fact that it is highly likely that most future G159 litigation will be filed in state courts (*see, e.g.*, the Other G159 Cases), and state court counsel will not necessarily investigate what might be contained in the Federal Reporter about the conduct of Goodyear and its counsel. We note also that the district court provided a form of safety valve in its non-monetary sanctions because "Goodyear may apply to the court hearing the case to be excused from [the requirements of the Order]."

We find that the district court's imposition of non-monetary sanctions against Goodyear is balanced, is narrowly tailored, and imposes no sanctions beyond what is necessary to remedy what the district court properly perceived as an ongoing problem in Goodyear's G159 litigation. The district court did not abuse its discretion in imposing non-monetary sanctions on Goodyear.

## CONCLUSION

For the reasons noted in this opinion, we hold that the district court did not abuse its discretion in imposing sanctions in the sum of $548,240 against Hancock, and $2,192,961 jointly against Musnuff and Goodyear. The district also did not abuse it discretion in imposing non-monetary sanctions against Goodyear.

We affirm the monetary and non-monetary sanctions set forth in the district court's Order.

The Sanctionees shall bear all costs in this appeal.

**AFFIRMED.**

---

WATFORD, Circuit Judge, dissenting:

Goodyear and its lawyers were accused in this case of perpetrating a fraud on the Haegers and the court. If sustained, those charges could of course severely damage the professional reputations of the lawyers involved. The district court accordingly approached the task of determining whether the charges were true with great thoroughness and care. After conducting a lengthy evidentiary hearing and reviewing multiple rounds of briefing, the court concluded that Goodyear and its lawyers acted in bad faith when they failed to produce test results that were responsive to the Haegers' document requests. I agree with the majority that the district court's misconduct findings are supported by the record, but I nevertheless conclude that the $2.7 million sanctions award must be vacated.

The district court's finding of bad faith authorized it to levy sanctions under its inherent power. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). Those sanctions could have taken one of two forms: punitive sanctions, which are criminal in nature and intended to vindicate the authority of the court; or compensatory sanctions, which are civil in nature and designed to compensate the injured party for losses sustained as a result of the misconduct. *Miller v. City*

*of Los Angeles*, 661 F.3d 1024, 1029–30 (9th Cir. 2011); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1136–42 (9th Cir. 2001).[1]

The district court chose not to impose punitive sanctions. Doing so would have required the court to follow procedures applicable in criminal cases, such as appointing an independent prosecutor, affording the accused the right to a jury trial, and demanding proof of misconduct beyond a reasonable doubt. *Miller*, 661 F.3d at 1030. Compensatory sanctions, by contrast, may be imposed by the court acting alone after providing adequate notice and an opportunity to be heard. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110 (9th Cir. 2005). That is the route the district court chose to follow here. The question for us is whether the court correctly labeled the sanctions compensatory. If it did not—if the sanctions are instead punitive—they cannot stand. *See Miller*, 661 F.3d at 1029–30; *F.J. Hanshaw*, 244 F.3d at 1141–42.

In my view, the $2.7 million sanctions award cannot be deemed compensatory. The award could be compensatory only if the record reveals a causal connection between the misconduct the court found and the amount it awarded. *See Miller*, 661 F.3d at 1029–30. The $2.7 million award represents all of the attorney's fees incurred by the Haegers after Goodyear breached its discovery obligations, including fees for the years of litigation that ensued before the parties settled on the first day of trial. The court purported to find

---

[1] Sanctions may also be civil in nature if they are "designed to compel future compliance with a court order." *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994). The sanctions imposed here could not serve that function because the litigation between the Haegers and Goodyear had long since ended.

the necessary causal link between the misconduct and the fees awarded on the theory that, if Goodyear had produced the test results when it was supposed to, "the case more likely than not would have settled much earlier." I do not think that finding is supported by the record.

Our decision in *Miller v. City of Los Angeles*, 661 F.3d 1024 (9th Cir. 2011), illustrates the deficiency. In that case, the district court found that defense counsel violated an in limine order by suggesting during closing arguments that the decedent was armed when the defendant police officer shot him. *Id.* at 1026. The trial ended in a hung jury. The district court awarded the plaintiffs all fees incurred during the trial as a compensatory sanction, presumably on the theory that defense counsel's improper closing argument caused the jury to hang, thus necessitating a retrial and rendering all of the fees incurred during the first trial a waste. We concluded that the award could not be deemed compensatory. *Id.* at 1030. The record did not establish a causal connection between the lawyer's misconduct and the jury's inability to reach a verdict. It was simply impossible to know, on the record compiled in that case, why the jury could not reach a verdict, and the limited evidence available suggested that it was not because of defense counsel's improper remarks. *Id.*

The record in this case is similarly devoid of evidence establishing a causal link between Goodyear's misconduct and the fees awarded. It's anyone's guess how the litigation would have proceeded if Goodyear had disclosed all responsive test results from the start. The case might have settled right away, as the district court assumed, but that seems unlikely. The test results did not provide conclusive proof that the Haegers' tire failed due to its defective design. To be sure, the test results were favorable to the Haegers:

The results supported the Haegers' theory that Goodyear sold tires that were prone to failure when used on motor homes at highway speeds, especially in hot driving conditions like those prevailing at the time of the Haegers' accident in Arizona. But even if those test results had been put before the jury, Goodyear still planned to argue that the Haegers' own tire, which had endured more than 40,000 miles of wear and tear, failed because it struck road debris, not because the tire was defective. And Goodyear has consistently maintained (whether rightly or wrongly) that the test results it concealed do not accurately predict tire behavior in real-world driving conditions.

If anything, it seems more plausible to assume that the case would have proceeded to trial had the test results been timely disclosed. The Haegers' grievance is that they accepted a low-ball settlement from Goodyear on the eve of trial under false pretenses. The concealed test results, they contend, would have significantly strengthened their hand. That suggests the Haegers would have been willing to take their case to the jury if Goodyear had refused to increase its offer, but it does not suggest that Goodyear would have thrown in the towel and met the Haegers' demands. In fact, the only relevant data point in the record supports the opposite conclusion. In the *Schalmo* case, one of the other motor home accident suits involving the same allegedly defective tire, Goodyear produced the test results at issue, but the plaintiffs and Goodyear elected to take the case to trial (with the jury returning a sizeable verdict for the plaintiffs). Goodyear did not settle that case immediately upon disclosure of the test results, as the district court assumed would have happened here.

In short, we simply don't know—and have no way of reliably figuring out—what would have happened if timely disclosure of the test results had occurred. Thus, I think the district court clearly erred in finding that "the case more likely than not would have settled much earlier" had Goodyear disclosed the test results when it should have.

The majority does not contend that a causal connection between Goodyear's misconduct and the fees awarded has been shown here, as required for the sanctions to be deemed compensatory. The majority instead contends that *Miller*'s causation requirement "flouts controlling United States Supreme Court case law." Maj. op. at 30. I don't think that's true. *Miller*'s discussion of causation did not break new ground; it simply reflects the well-established principle, fully consistent with Supreme Court precedent, that a sanction can be deemed compensatory only if it compensates the injured party for losses sustained *as a result of* the sanctionable misconduct. *See, e.g.*, *Lasar*, 399 F.3d at 1111; *F.J. Hanshaw*, 244 F.3d at 1142. What we said about causation in *Miller* merely illustrates why the fees awarded in this case were not sustained *as a result of* Goodyear's misconduct.

The majority reads *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), as establishing a competing principle: that a fee award may be deemed compensatory even if the fees were *not* incurred as a result of the sanctionable misconduct, so long as the misconduct involves "frequent and severe abuses of the judicial system." Maj. op. at 32. The majority assumes that principle must be valid because, in its view, not all of the fees awarded to NASCO were incurred as a direct result of Chambers' misconduct.

I see two problems with the majority's reading of *Chambers*. First, it is by no means clear as a factual matter that the majority's reading is correct. The district court in *Chambers* expressly held that Chambers' misconduct began even before NASCO formally filed suit. After Chambers informed NASCO that he would not honor the agreement to sell his local television station, NASCO gave Chambers notice on a Friday that it intended to file suit the following Monday seeking specific performance. That advance notice was required by court rules because NASCO also intended to seek a temporary restraining order preventing Chambers from disposing of the station pending resolution of the suit. 501 U.S. at 36. Rather than acknowledge that he had no valid defense to the suit, and that he therefore had no business putting NASCO to the expense of filing it, Chambers embarked on what turned out to be a years-long campaign of bad-faith litigation misconduct, beginning with his efforts over the weekend to fraudulently transfer ownership of the station in order to deprive the district court of jurisdiction. *Id.* at 36–37. Because the district court found that Chambers never had a good-faith basis for resisting the relief NASCO sought, and that all of the actions he took in "defending" the suit were aimed solely at obstructing and delaying the inevitable sale of the television station, it seems fair to say that all of NASCO's attorney's fees were incurred as a direct result of Chambers' misconduct. *See id.* at 50–51.

Second, even if some portion of NASCO's attorney's fees were *not* incurred as a direct result of Chambers' misconduct, the majority incorrectly assumes that the Supreme Court upheld the award as purely compensatory. The sanction imposed there was not purely compensatory; it served the "dual purpose" of (1) vindicating the court's own authority and (2) "mak[ing] the prevailing party whole for expenses

caused by his opponent's obstinacy." *Id.* at 46 (internal quotation marks omitted). The first of these purposes, we have subsequently held, is the domain of punitive sanctions, and the Court in *Chambers* left no doubt that punishment was indeed a key purpose of the sanctions imposed in that case. *See id.* at 55 n.17 ("the sanctions imposed on Chambers were aimed at punishing not only the harm done to NASCO, but also the harm done to the court itself"). Because it was partly punitive, the sanctions award did not need to be limited to fees directly caused by Chambers' misconduct.

I concede that the district court imposed the sanctions in *Chambers* without applying the heightened procedural protections we have subsequently held are necessary before punitive sanctions may be imposed, and that the Supreme Court nonetheless affirmed. I don't think we can read anything into that fact. The defendants in *Chambers* did not raise any due process arguments, and the Supreme Court therefore did not address whether the process afforded the defendants was adequate. Moreover, the law has changed since *Chambers* was decided. A few years later the Court issued *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821 (1994), the case from which we first derived the rule that imposition of punitive sanctions must be accompanied by the procedural protections applicable in criminal cases. *See F.J. Hanshaw*, 244 F.3d at 1137–38. If any doubts lingered about whether *Chambers* authorizes imposition of so-called "dual purpose" sanctions without following the procedures applicable in criminal cases, we put those to rest in *Miller*. The dissent in *Miller* made that very argument, 661 F.3d at 1039 (Ikuta, J., dissenting), but the panel majority implicitly rejected it. *See id.* at 1030.

None of this is to suggest that compensatory sanctions can't be fashioned at all. There may well be other ways to calculate the losses sustained by the Haegers as a result of the misconduct. For example, the most direct loss the Haegers sustained is that they probably settled their case for less than it was really worth. It might be possible to use the *Schalmo* case, and others like it if they exist, to calculate the difference between what the Haegers actually received in settlement and what they likely would have received—whether through an enhanced settlement or a jury verdict—if the test results had been disclosed in a timely manner. But going down that path would obviously be fraught with proof problems of its own.

Alternatively, instead of attempting to calculate lost settlement value, the district court could again focus on attorney's fees incurred by the Haegers, limiting the award to fees that can be linked in a non-speculative way to the misconduct. The fees that most readily spring to mind are those wasted on expert discovery that took place under the mistaken assumption that key test results supporting the Haegers' liability theory did not exist. Those and other fees similarly traceable to the misconduct are no doubt comparatively small, but I don't think the district court was right in suggesting that calculating them would be an impossible task. Those fees can be calculated; it's just that they may produce a sanction smaller than seems warranted given the severity of the misconduct the district court found.

If the sanctions that can properly be deemed compensatory seem too paltry under the circumstances, the district court could still fashion an award of punitive sanctions, so long as it applies the corresponding heightened procedural protections. *See Miller*, 661 F.3d at 1030–31; *F.J. Hanshaw*, 244 F.3d at 1141–42. Because Goodyear and its

lawyers were not afforded those protections before punitive sanctions were imposed, I dissent from the majority's affirmance of the $2.7 million award.